**ARASERV, INC.**

v.

**BAY STATE HARNESS HORSE RACING AND BREEDING ASSOCIATION, INC., et al.**

Civ. A. No. 77–0343–F.

United States District Court,
D. Massachusetts.

July 7, 1977.

A. Theodore Welburn, Gravill & Ley Inc., Boston, Mass., for plaintiff.

Allen E. Erickson, Town Counsel, Foxborough, Mass., for Bd. of Selectmen, Foxborough.

James J. Marcellino, Daniel B. Bickford, Gaston, Snow & Ely Bartlett, Boston, Mass., for Bay State Harness.

Mark Witkin, Bloom, Rosenwald & Witkin, Boston, Mass., for Foxboro Associates.

William J. Eisen, Lourie & Cutler, Boston, Mass., for Elias M. Loew.

Earle C. Cooley, Robert D. Keefe, Hale & Dorr, Boston, Mass., for Keelan, N. E. Harness Raceways, EJK Inc., Foxboro Associates, and Raceway Concessions Inc.

## MEMORANDUM

FREEDMAN, District Judge.

This matter is before the Court on the plaintiff's motion for a preliminary injunction. On June 22, 1977, the Court issued an order denying plaintiff's motion. This memorandum sets forth the findings of facts and conclusions of law upon which that order was based. In order to obtain preliminary injunctive relief, the plaintiff must show it has a reasonable probability of success on the merits of its claim and that without such relief it will suffer immediate and irreparable harm. *McDonough v. First*

*National Boston Corp.,* 416 F.Supp. 62 (D.Mass.1976), and cases cited therein. For the reasons set forth below, the Court does not believe that plaintiff has met these requirements.

The plaintiff, Araserv, Inc. ("Araserv") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Araserv is in the food service concessionaire business selling food and food products, beverages, tobacco products, souvenirs, magazines and publications at sports stadia, race tracks, state and national parks, convention centers and recreational facilities throughout the United States. The suit is brought against multiple defendants. Defendant Bay State Harness Horse Racing and Breeding Association, Inc. ("Bay State") is a Massachusetts corporation with its principal place of business in Milton, Massachusetts. Defendant Elias M. Loew ("Loew") is a citizen of Massachusetts and is the president, treasurer, a director and major shareholder of Bay State. Defendant New England Harness Raceway, Inc. ("New England") is a Massachusetts corporation with its principal place of business in Foxboro, Massachusetts. Defendant Edward J. Keelan ("Keelan") is a citizen of New Hampshire. Keelan is the president and a director of New England. Defendant Foxboro Associates ("Foxboro") is a Massachusetts limited partnership, formed pursuant to M.G.L. c. 109 and has a principal place of business in Foxboro, Massachusetts. Defendant EJK, Inc. ("EJK") is a Massachusetts corporation with a principal place of business in Foxboro, Massachusetts. EJK is the general partner of Fox-

boro. Keelan is the president of EJK. Defendant Raceway Concessions, Inc. ("Raceway Concessions") is a Massachusetts corporation with its principal place of business in Foxboro, Massachusetts. Keelan is also the president and a director of this corporation.

This action is basically one for breach of contract. Plaintiff seeks to enforce a contract executed by Bay State and Araserv which gave Araserv the right to operate a concession business at a certain race track then owned by Bay State and known as the Bay State Raceway. The track was sold to Foxboro and New England [1] before the termination date of this contract. Plaintiff now asks the Court to enjoin the defendants from interference with said contract,[2] to assess damages for breach of that contract in the event the contract is not enforced,[3] to declare the rights and liabilities of the parties relative to certain promissory notes and mortgages, and to award damages against the defendants Keelan, New England, EJK, Loew, and Raceway Concessions for interference with plaintiff's concession contract.[4]

On June 20, 1972, Bay State and Araserv entered into a five-year exclusive concession agreement whereby Araserv was to operate the concession facilities at the Bay State Raceway owned by Bay State. By subsequent amendments to this contract, the term of the agreement was extended to 1987. In addition to setting forth the nature of the concession agreement, the contract contains a clause which reads as follows:

> This Agreement shall be binding upon and shall inure to the benefit of Bay

---

1. See pages 1087–1088, *infra.*

2. Plaintiff's request for a temporary restraining order on February 7, 1977 was denied by the Court. Plaintiff had sought to enjoin certain state proceedings regarding the revocation of plaintiff's liquor license. Such proceedings resulted from defendant Raceway Concessions' efforts to obtain a liquor license and defendant New England's attempt to have the license held by plaintiff revoked.

3. This includes the plaintiff's right to reach and apply certain monies due the defendants Bay State and Loew from the defendants Keelan, EJK, Foxboro and New England in satisfaction of such damages.

4. In addition to these claims plaintiff seeks a damage award against Loew for breach of a consulting agreement and breach of fiduciary duties allegedly owed to the plaintiff and plaintiff also seeks to reform a mortgage instrument and a subordination agreement concerning that

State, ARA,[5] and their respective successors and permitted assigns.

On the date of execution of the concession agreement, June 20, 1972, Araserv also entered into a consulting agreement with Loew whereby Araserv agreed to pay Loew certain sums of money in return for consulting services rendered by Loew on behalf of Araserv at the race track for a term of five years, but terminating at an earlier date if the concession agreement terminated earlier. On June 11, 1975, the consulting agreement was amended by increasing Loew's compensation for the year 1976.

Araserv made various loans to Bay State pursuant to promissory notes executed by Bay State and dated June 20, 1972, June 25, 1973, June 11, 1975, March 26, 1976, and May 20, 1976. To secure payment on these loans, on May 20 and May 21, 1976, Bay State granted to Araserv mortgages on a portion of the Raceway realty.[6] These mortgages were duly recorded in the Norfolk County Registry of Deeds.

In the spring of 1976, Keelan entered into negotiations with Loew and Bay State concerning the possible purchase of Bay State's assets. Loew refused to sell Bay State's assets to Keelan unless Keelan purchased or caused to be purchased 88% of the common stock and 85% of the preferred stock of Audubon Raceway, Inc. which operated a harness track in Kentucky.

On August 31, 1976, Keelan entered into a written agreement with Bay State and Loew, pursuant to the terms of which, Bay State granted to Keelan, or Keelan's corporate nominee, an option to purchase the assets of Bay State, exercisable by Keelan upon his purchase of the aforesaid shares of stock in Audubon, or upon Loew's failure to fulfill certain conditions precedent to Keelan's purchase of said stock. The agreement stated that the "[e]xercise of the option shall be made by Keelan's delivery of written notice of same to Bay State before the end of the option period." The option period was one year. Pursuant to the terms of said agreement, the purchase price of the assets of Bay State was stated to be $10,000,000, which price the parties agreed had been calculated on the basis of these assets: land; plant; personal property and equipment; and concession contract with Araserv.

The August option agreement included the following provisions. Keelan was to pay Bay State $2,000,000 on the date of purchase while Bay State was to give good and marketable title, free from all encumbrances except those expressly stated. Keelan was to purchase the property subject only to those obligations of Bay State listed on a separate Schedule B. The concession contract with Araserv is listed in Schedule B. However, Keelan expressly denied

> liability or obligation to pay any sums which might be presently due ARA Serv, Inc. or which might become due to ARA Serv, Inc. according to any promissory note made by Bay State and/or Loew.

Loew agreed

> to obtain and deliver to Keelan upon Keelan's purchase of all assets of Bay State a release of Keelan by ARA Serv, Inc. of any obligation or sum to become due and payable to ARA Serv, Inc. as a result of any concession sales, loans or otherwise from prior to Keelan's purchase of said assets.

In the August option agreement, Keelan also agreed to pay Loew the sum of $34,125 per year for a period of thirteen years for consulting services which Loew agreed to furnish to Audubon and Keelan.

The August option contained an additional clause relative to those having contractual relations with Bay State which provides:

> That Keelan's purchase of . . . the assets of Bay State shall not accelerate, make voidable, nor breach any con-

---

mortgage. These claims are not involved in the present motion.

**5.** The concession agreement refers to ARASERV, INC. as ARA.

**6.** A first mortgage on the property is held by Commonwealth Bank and Trust Co. Lloyd Keith holds a second mortgage on the property.

tractual obligation (including those with labor unions) any mortgage, or other debt, nor place . . . Bay State and/or Keelan in default thereunder. It is also agreed that Loew and Bay State shall furnish and deliver to Keelan properly executed letters from each mortgagee of property owned by . . . Bay State and from each person or organization party to any contract remaining in effect pursuant to the terms hereof certifying said facts, which letters shall be delivered to Keelan prior to any sale hereunder.

On November 15, 1976, Keelan entered into an agreement with Bay State and Loew which was subsequently amended the same date and on November 30, 1976. As amended, it provided for Keelan or his nominee to purchase the assets of Bay State for a price of $9,650,000. Part of that price was to be paid by Keelan's payment of certain obligations listed in an annexed Schedule A, by Keelan's making of capital improvements and/or structural repairs to the raceway, and by the payment of any undisclosed claims, liabilities or obligations of Bay State which might be required in order to conduct racing operations at the track. The agreement explicitly stated that the liabilities listed on Schedule A shall constitute the total liability assumed by Keelan. All other liabilities, contractual or otherwise were expressly not assumed. The concession agreement between Bay State and Araserv was not listed on Schedule A. Araserv's mortgages, however, were listed. Keelan agreed that the conveyance of the real estate might be made subject to Araserv's mortgages, but he did not agree to become liable on the promissory notes secured thereby.

The November agreement contains a clause like that in the August option agreement that Keelan's purchase shall not breach any contractual obligation and requiring letters from each party to any con-

tract remaining in effect pursuant to the terms of the agreement and certifying said facts.[7] The November contract also contains a clause requiring Bay State to secure the written approval of all mortgagees of the assets of Bay State. Delivery of this written approval shall be a condition precedent to Keelan's obligation under the agreement. And finally, in addition to the purchase agreement, Keelan agreed to pay Loew $100,000 per year for three years for consultation services.

On the same date, November 15, 1976, Keelan named Foxboro as his corporate nominee and transferee of all of Bay State's assets. Keelan further substituted New England as transferee of all licenses and permits necessary for conducting harness racing at the raceway. Bay State subsequently executed a deed to the raceway to Foxboro.[8] The track's name was changed to New England Raceway. On December 1, 1976, the Commonwealth of Massachusetts Racing Commission transferred Bay State's harness racing license to New England. Since this date, New England has operated and continues to operate the raceway and all of its harness racing events.

Counsel for Foxboro and New England sent notice to Araserv that the concession agreement was not binding on New England. From December 1, 1976 until January 14, 1977, New England attempted to negotiate a new concession agreement with Araserv. These negotiations were unsuccessful and on January 14, 1977, New England sent notice to Araserv to terminate its operation and remove its property no later than March 31, 1977.[9] New England also directed Araserv to immediately remit to New England a check representing 50% of the net concession receipts collected by Araserv at the raceway since December 1, 1976. As of January 14, 1977, Araserv had not paid any concession revenue to New Eng-

---

7. See pages 1086–1087, supra.

8. The sale of the race track was not disclosed in advance to Araserv.

9. From December 1, 1976 until March 31, 1977, New England conducted what is known as its winter meet of licensed harness horse racing. Its summer meet commenced June 24, 1977.

land.[10] New England further instructed that if Araserv continued its operations at the raceway that it might do so only on the aforesaid 50% net receipt basis, which receipts were to be remitted to New England on a daily basis. Araserv was also instructed that if it did not comply with the aforesaid terms that it must immediately quit and vacate the raceway, terminating all its operations there.

On or about January 21, 1977, New England entered into an agreement with Raceway Concessions whereby Raceway Concessions would operate the concession business at the New England Raceway. On January 24, 1977, Raceway Concessions filed with the Town of Foxboro Board of Selectmen and Licensing Authorities ("Board of Selectmen") an application for a common victualler's license at the New England Raceway. On January 25, 1977, the Board of Selectmen granted this license to Raceway Concessions. On January 24, 1977, Raceway Concessions filed with the Board of Selectmen an application for a liquor license at the New England Raceway and an application to revoke Araserv's liquor license at the New England Raceway. On February 3, 1977, plaintiff commenced this action.

On or about February 22, 1977, the Board of Selectmen revoked Araserv's liquor license at the New England Raceway and granted a liquor license to Raceway Concessions. On February 28, 1977, Araserv appealed the decision of the Board of Selectmen to the Alcoholic Beverages Control Commission ("ABCC"). On or about March 26, 1977, the ABCC entered a decision, remanding the matter to the Board of Selectmen with a recommendation that the revocation order be vacated because the ABCC

found that the "present licensee (Araserv) has and is operating on the licensed premises," and further found "no basis for revocation as set forth in the statement of reasons issued by the Board of Selectmen of Foxboro."

On March 31, 1977, New England sent a written notice to Araserv stating that the plaintiff, its employees or agents would be denied use or occupation of the raceway premises as of midnight that date. The notice stated additionally that the plaintiff would be permitted access to the premises on April 1 and April 2, 1977 in order to conduct an inventory and remove from the premises its food and accounting records. New England told Araserv that upon submission of the requested list, description and proof of ownership of equipment, arrangements could be made for the removal of equipment and tangible personal property belonging to Araserv at the raceway. Such a list has been submitted to the Court by way of affidavits, although defendants assert they have not received such information or adequate proof of ownership.

On April 1, 1977, New England's security guards changed the locks on the entrances and exits of the New England Raceway. On April 5, 1977, Thomas Marchetto, acting on behalf of Araserv, made an entry upon a portion of the premises at New England Raceway on April 5, 1977 to take possession as mortgagee of the concession areas at the New England Raceway for breach of condition.[11] However, defendants have refused to recognize the plaintiff's asserted right to possession and have barred plaintiff from the premises. Defendants' lock-out of the plaintiff continues until the present time.[12]

**10.** Pursuant to its loans made to Bay State, Araserv had the right to apply certain concession revenue to the balance owed on Bay State's promissory notes.

**11.** Both of the mortgages held by Araserv make reference to the customary "Statutory Condition" set forth in M.G.L. c. 183 § 20, which includes a requirement that the mortgagor, his successors or assigns, "shall pay when due and payable all taxes . . . laid or assessed, whether on the mortgaged premises or on any interest therein or on the debt or

obligation secured thereby." In addition, both mortgages include specific provisions requiring payment of "all taxes . . . laid or assessed on the granted premises." These covenants had allegedly been breached by the nonpayment of taxes to the Town of Foxboro. Federal tax liens have also been placed on the property.

**12.** On April 12, 1977, at the request of the Foxboro Board of Selectmen, the selectmen made an inspection of the raceway premises. Plaintiff's counsel was denied access to the

■ The plaintiff asserts that by the agreement of November 15, 1976, Keelan exercised the option of August 31, thus making the Keelan defendants [13] liable for the concession agreement with Araserv. The defendants, however, maintain that the contract of November 15 was wholly independent of the August option and that said option was actually never exercised. They point to the differences in the terms of the two agreements, particularly the November agreement's exclusion of any assumption by Keelan of liability for the concession agreement with Araserv and the lack of any need in the November agreement for Bay State to obtain a release of Keelan for liability for said contract. Moreover, the purchase prices of the raceway and the accompanying consulting agreements were different in amount and in method of payment in the two agreements.

The circumstances surrounding the execution of the November agreement also indicate that this agreement was independent of the August option. The race track in question was a commercial track and it was therefore necessary to file a request for racing dates with the Commonwealth of Massachusetts Racing Commission no later than October 15 prior to the year for which the racing dates are requested. At the October 20, 1976 hearing before the Racing Commission on Bay State's application for racing dates, there was evidence that Bay State was in financial difficulty. Loew and Keelan believed that if 1977 racing dates were to be granted to the track, Loew would have to sell Bay State's assets and that such a sale agreement had to be executed and presented to the Racing Commission no later than November 15, 1976, the date by which the Commission's decision was to be made. Keelan maintains he informed Loew he would not exercise the August option and at Loew's request, Keelan entered into negotiations with Bay State, Loew and his representatives which culminated in the November 15 contract.

■ The Court concludes on the basis of the evidence presently before it and on the reasoning advanced by the defendants that the August option was not exercised by the execution of the November agreement. The question which thus remains is whether the November agreement expressly or impliedly imposed liability on the defendants for the concession contract between Bay State and Araserv. The plaintiff correctly points out that a succeeding corporation is liable on the contracts or obligations of its predecessor where it either assumes them under express agreement or where the facts and circumstances are such as to show an assumption. *Pittsfield General Hospital v. Markus*, 355 Mass. 519, 521, 246 N.E.2d 444 (1969). However, the Keelan defendants are not successors as that term is used in corporate law, nor have they assumed liability, either expressly or impliedly.

■ The purchase of the assets of Bay State and the assumption of some of their outstanding obligations in and of themselves do not make the defendants the legal successors of Bay State and as such bound by the concession contract. *International Association of Machinists and Local Lodge No. 954 v. Shawnee Industries, Inc.*, 224 F.Supp. 347, 352 (W.D. Okl. 1963). Fletchers Cyclopedia of the Law of Private Corporations, Vol. 15 § 7122. There are certain exceptions to the general rule that a company which purchases the assets of another company is not liable for the debts and liabilities of the transferor. These exceptions exist where:

(1) there is an express or implied assumption of liability; (2) the transaction amounts to consolidation or merger; (3) the transaction was fraudulent; (4) some

raceway for the purpose of asserting the mortgagee's alleged right to possession.

**13.** For purposes of this motion for a preliminary injunction, defendants Bay State and Loew have not been very actively involved. Therefore, subsequent reference in this memorandum referring to "defendants" or "Keelan defendants" are in fact joint references to New England Raceway, Inc., Foxboro Associates, EJK, Inc., Raceway Concessions, and Edward J. Keelan. The Court sees no necessity at this point in the litigation to make further distinctions among these defendants.

of the elements of a purchaser in good faith were absent; and (5) the transferee corporation was a mere continuation or reincarnation of the old corporation. *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1152 (1st Cir. 1974). Factual inquiry is therefore mandated to determine whether or not the defendants are liable on the concession contract made by their predecessor, Bay State.

The defendants argue that the term "successor" in corporate law is only applicable when one corporation by process of amalgamation, consolidation or duly authorized legal succession becomes vested in rights and assumes the burdens of its predecessor corporation. *International Association of Machinists and Local Lodge No. 954 v. Shawnee Industries, Inc., supra* at 352. Using this definition, the defendants in the present case would not be liable. The Court agrees that no formal merger or consolidation has occurred. However, whether or not a de facto merger has occurred for purposes of the assumption of liabilities is a much more difficult question. Liability based on just this type of merger or consolidation has been found to exist by various courts. *Shannon v. Samuel Langston Company*, 379 F.Supp. 797 (W.D.Mich.1974); *United States Fidelity & Guaranty Co. v. Citizens' National Bank*, 13 F.2d 213 (D. N.M. 1924); *Vicksburg & Y. C. Tel. Co. v. Citizens' Tel. Co.*, 79 Miss. 341, 30 So. 725 (1901). Factors which have led courts to make such a conclusion have included continuity of management, personnel, physical location, assets, general business operations, and shareholders, cessation by the selling corporation of ordinary operations, followed by liquidation and dissolution as soon thereafter as possible, and the purchasing corporation paying the purchase price with its own stock. The evidence submitted to the court up to this point has, however, shown that most, if not all of these factors are absent in the instant case.

█ Despite such absence, the Court is still somewhat disturbed by the fact, apparently undisputed, that the defendants had notice of the concession contract with the plaintiff, and that said contract had some ten years of operation remaining. Plaintiff asserts that such notice renders the defendants liable on that contract. Although the plaintiff has not pointed to the First Circuit's decision in *Cyr v. B. Offen & Co., Inc., supra*, in support of its contentions, I note that the Court of Appeals stated that the absence of some elements of a purchaser in good faith is an exception to the general rule exempting a purchasing corporation from liability for its predecessor's liabilities. 501 F.2d at 1152. Beyond this statement, however, there is no further explanation as to the precise meaning or scope of this exception. Neither of the authorities cited after the Court of Appeals' listing of the exceptions to the general rule negating liability provides sufficient additional aid. *West Texas Refining & Development Co. v. Commissioner of Internal Revenue*, 68 F.2d 77, 81 (10th Cir. 1933), so cited by the First Circuit, states that an exception to the general rule exists

> (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.* Assuming that this encompasses the same situations encompassed by exceptions (3) and (4) as articulated by the First Circuit, I am not convinced at this point that there is a likelihood that the plaintiff will be able to prove such a situation existed in the transaction under scrutiny in the present action. The plaintiff has made allegations and submitted some evidence which question the intent and purposes of all the defendants in entering into the sale of the race track. Plaintiff asserts that the defendants have attempted to escape liability on the concession contract by intentionally leaving an allegedly insolvent corporation, Bay State, solely liable on the contract. There has been no allegation that the purchase price was unreasonable, although plaintiff has raised doubts as to the propriety of aspects of the method of payment. While plaintiff may well be able to prove its case at the subsequent trial on the merits, I do not believe there is now sufficient evidence on the record to demonstrate bad

faith on the part of the Keelan defendants to establish a likelihood of success on such an allegation.

The November contract is certainly not an express agreement by the Keelan defendants to assume liability on the concession agreement with Araserv. This is, of course in contrast to the August option agreement. Nor does there appear to be evidence to demonstrate a likelihood of success on any claim that the Keelan defendants impliedly accepted liability for the concession contract. None of the other exceptions to the general rule imposing no liability on the purchasing corporation for the debts and liabilities of its predecessor have been asserted by the parties or appear to the Court to be relevant.

Plaintiff asserts certain other theories in support of its request for a preliminary injunction. These are basically three-fold. First, that the contract allowing Araserv to conduct the concession business at the race track is a covenant running with the land and therefore binding on the Keelan defendants as transferees of Bay State and thus owners of the race track property. Second, that the plaintiff, as mortgagee, made a lawful entry upon the mortgaged property on April 5, 1976, entitling it to possession of the concession areas. Plaintiff contends the Keelan defendants' lockout of the plaintiff from the property and their subsequent refusal to allow the plaintiff reentry constitutes a continual trespass which should be enjoined. And finally, the actions of the Keelan defendants in purchasing the property which they knew was essential to the fulfillment of the concession contract between the plaintiff and Bay State constituted a tortious interference with the plaintiff's contractual rights. Moreover, since Bay State is now allegedly insolvent, any monetary judgment against Bay State would be worthless. Therefore, plaintiff argues that it is entitled to receive an injunction against the Keelan defendants' tortious interference with the enforcement of the concession contract. I will discuss each of these arguments separately.

Plaintiff contends that the concession agreement constitutes a covenant that runs with the land and is therefore binding not only upon Bay State but also subsequent owners of the raceway. Thus plaintiff argues that the defendants became liable on the concession agreement when they purchased the track. The defendants have not addressed themselves directly to this issue. While the plaintiff has pointed to authority to support its argument, *Baseball Publishing Co. v. Bruton,* 302 Mass. 54, 18 N.E.2d 362 (1938); *Whittenton Manufacturing Co. v. Staples,* 164 Mass. 319, 41 N.E. 441 (1895), the Court cannot state at this point that the plaintiff necessarily has a likelihood of success on this point. The interest which Bay State granted the plaintiff by way of the concession agreement may have terminated upon the alienation of the property. *Nelson v. American Telephone & Telegraph Co.,* 270 Mass. 471, 170 N.E. 416 (1930). *Cf. Johnson v. Wilkinson,* 139 Mass. 3, 29 N.E. 62 (1885). But *cf. Empire Natural Gas Co. v. Southwest Pipe Line Co.,* 25 F.2d 742 (N.D.Okl.1928), *aff'd* 33 F.2d 248 (8th Cir. 1929). And this may be so even though the defendants had knowledge of the plaintiff's concessionaire business on the premises. *Nelson v. American Telephone & Telegraph Co., supra.* Bay State, however, may still be liable to Araserv for breach of contract. *Druker v. Roland Wm. Jutras Assoc., Inc.,* 1976 Mass. Adv.Sh. 1408, 1411, 348 N.E.2d 763; *Eastern Mass. St. Ry. v. Union St. Ry.,* 269 Mass. 329, 332, 168 N.E. 781 (1929); *Proctor v. Union Coal Co.,* 243 Mass. 428, 432, 137 N.E. 659 (1923).

As additional support for its motion for preliminary injunctive relief, plaintiff contends that as a mortgagee of the race track property, it has a right to possession of those premises upon the breaking of a condition of the mortgage. The plaintiff maintains that the failure to pay taxes constitutes just such a violation of a mortgage condition.[14] The plaintiff reasons that upon default on the mortgage, the mortgagee

---

**14.** See n. 11, *supra.*

may enter onto the mortgaged premises with or without the intent to foreclose on the mortgage, and take possession of all or any part of said premises. The defendants do not dispute the failure to pay taxes. However, the defendants assert that the mortgagee cannot make an entry upon the mortgaged premises for condition broken unless the entry is made for the purpose of foreclosure and possession of the entire premises is taken. I disagree with both of defendants' arguments.

In Massachusetts, the mortgagee has legal title to the mortgaged property and the mortgagor retains an equity of redemption. *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass. 770, 291 N.E.2d 609 (1973). Until default in the performance or observance of the condition of a mortgage, the mortgagor and his heirs and assigns may, unless otherwise stated in the mortgage, hold and enjoy the mortgaged property and receive the rents and profits thereof. *Id.* M.G.L. c. 183 § 26. However, M.G.L. c. 244 § 1 provides that:

> Foreclosure by entry or action; continued possession. A mortgagee may, after breach of condition of a mortgage of land, recover possession of the land mortgaged by an open and peaceable entry thereon, if not opposed by the mortgagor or other person claiming it, or by action under this chapter; and possession so obtained, if continued peaceably for three years, shall forever foreclose the right of redemption.

■ The instant case presents the somewhat unusual situation where the mortgagee desires to take possession of the mortgaged property while expressly disclaiming an intent to foreclose. *Cf. Skolnick v. East Boston Savings Bank,* 307 Mass. 1, 29 N.E.2d 585 (1940). It is important to note that most of the case law involving the mortgagee's right of entry and possession upon default assumes that foreclosure is the intended purpose and analyzes the issues in light of this assumption. *E. g., Hawkes v. Brigham,* 82 Mass. 561 (1860). The defendants cite language in several cases that

speak of the mortgagee's entry with reference to subsequent foreclosure. *E. g., Joyner v. Lenox Savings Bank,* 322 Mass. 46, 76 N.E.2d 169 (1947); *Hawkes v. Brigham, supra.* Nevertheless, I conclude that there is nothing in these cases or in any of the other relevant case law analyzed by the Court which suggests that intent to foreclose is a necessary requirement to a lawful entry. Nothing in the statutory provisions supports such a requirement. The language in M.G.L. c. 183 § 26 does not deal with the actual entry or the procedure by which the mortgagee takes possession. The language in M.G.L. c. 244 § 1, which establishes the right of entry, does not refer to any intent or purpose requirement on the part of the mortgagee. This statute only states that foreclosure shall be the *effect* of that entry if possession by the mortgagee continues peaceably for three years.

■ If foreclosure is to be effectuated, the mortgagee must, in addition to M.G.L. c. 244 § 1, also comply with M.G.L. c. 244 § 2, which provides:

> Entry without judgment; certificate; recording. If an entry for breach of condition is made without a judgment, a memorandum of the entry shall be made on the mortgage deed and signed by the mortgagor or person claiming under him, or a certificate, under oath, of two competent witnesses to prove the entry shall be made. Such memorandum or certificate shall within thirty days after the entry, except as provided in section seventy of chapter one hundred and eighty-five, be recorded in the registry of deeds for the county or district where the land lies, with a note of reference, if the mortgage is recorded in the same registry, from each record to the other. Unless such record is made, the entry shall not be effectual for the purposes mentioned in the preceding section.

According to the plaintiff, the requisite certificate [15] in the present case was never recorded in the appropriate Registry of Deeds because the plaintiff never intended

---

**15.** This certificate was made, although not recorded.

to foreclose. However, on the same line of reasoning as their assertion that an intent to foreclose is necessary for a valid entry, the defendants point to this failure to record as further support for their argument that the plaintiff's entry was a nullity. I disagree with defendants' argument.

It has been held in Massachusetts that [a]n entry by a mortgagee while the breach [of the mortgage condition] continued, even if ineffectual for the purpose of foreclosure under G.L. (Ter.Ed.) c. 244, § 1, was valid for the purpose of collecting the rents and profits and the mortgagee would then become liable to account to the mortgagor.

*Corrigan v. Payne,* 312 Mass. 589, 591–92, 45 N.E.2d 829, 831 (1942). *Cook v. Johnson,* 121 Mass. 326 (1876). In *Corrigan,* the mortgagee had not recorded the certificate of entry as required by M.G.L. c. 244 § 2. The defendants in the present action have failed to bring to the Court's attention any reason why the rights of the mortgagee should not be the same whether the mortgagee unintentionally fails to record the certificate of entry or whether such failure to record was intentional because the mortgagee never had any intention of foreclosing, but merely wished to retain possession of the property.

 The defendants also assert that the plaintiff's entry of April 5 was a nullity because the plaintiff only took possession of the concession areas and not of the entire mortgaged property. The Court finds no support for this argument. It has been held by the Massachusetts courts that a mortgagee may make a valid entry under the statute and yet allow the mortgagor to remain in actual possession. *Cunningham v. Davis,* 175 Mass. 213, 222, 56 N.E. 2 (1900). It has also been held in Massachusetts that a mortgagee who enters upon one tract of land under a mortgage which covers two separate and distinct tracts of land is valid as an entry upon the entire mortgaged premises. *Bennett v. Conant,* 64 Mass. 163, 165 (1852). Combining these two principles, the Court concludes that a mortgagee may make a valid entry onto part of

the mortgaged premises—here, the concession areas—and retain possession of that portion of the property for himself, while allowing the mortgagor, or one claiming under him, to retain possession of the remaining part of the property.

Assuming that the plaintiff, as mortgagee, made a proper entry upon the race track property, the Court must decide whether the plaintiff presently has or is entitled to possession of that property. This turns on a determination of whether the plaintiff has retained possession, either actual or constructive, since the entry. If it has not retained possession, a new entry would be required to gain possession. There is no evidence that a re-entry has occurred.

There is Massachusetts case law to the effect that "the mortgagor, and all claiming under him, are conclusively prevented from holding adversely to his [the mortgagee's] paramount right." *Long v. Richards,* 170 Mass. 120, 128, 48 N.E. 1083, 1086 (1898). While at first glance, such a statement might preclude any claim by the defendants that Araserv, as mortgagee, could be ousted of possession by the defendants, language in subsequent decisions and in the statutory provision itself indicates to the contrary. In *Ramos v. Mello,* 328 Mass. 320, 322, 103 N.E.2d 709, 710, the Court, in quoting its earlier decision of *Holmes v. Turner's Falls Co.,* 150 Mass. 535, 549, 23 N.E. 305 (1890), which had also been cited by the Court in *Long v. Richards, supra,* stated that "neither the mortgagor nor his grantee holds adversely to the mortgagee, until he has distinctly disclaimed holding under him and asserted title in himself." *See Worcester v. Bennett,* 310 Mass. 400, 404, 38 N.E.2d 647, 650 (1941) ("It may be assumed *in the absence of anything to the contrary* that his possession was sufficiently peaceful to satisfy the more or less fictional requirement of the statute.") (emphasis added); *Cunningham v. Davis, supra,* 175 Mass. at 222, 56 N.E. at 5. ("After the entry to foreclose the mortgagor and those claiming under him became tenants at sufferance of the mortgagee, and, *in the absence of any evi-*

**1094**

*dence of an adverse holding,* they are assumed to hold under him . . ..") (emphasis added).[16]

■ The statutory language of M.G.L. c. 244 § 1 adds further strength to the argument that the mortgagee's possession, to be valid, must be peaceable and unopposed. To begin with, the statute provides that the entry itself must be "open and peaceable" and "not [be] opposed by the mortgagor or other person claiming [the mortgaged property]." This same statutory provision which allows the mortgagee the right of entry also requires that possession be "peaceable", at least in so far as it relates to the possessory requirement for foreclosure. However, as already noted, even if foreclosure does not result, the entry is valid for the purpose of allowing the mortgagee possession for the purpose of receiving rents and profits. The Court believes the same standard should be applicable whether possession was obtained by the mortgagee's entry without the intent to foreclose or whether possession resulted from an unsuccessful foreclosure attempt. Thus possession must be peaceable and unopposed in either case.

■ Such was clearly not the situation in the present case. While Araserv's initial entry may have been unopposed, the defendants' "lock-out" of the plaintiff demonstrates the plaintiff's continued possession of the property was certainly opposed. The lock-out was essentially an ouster. Consequently, plaintiff's argument that it is entitled to possession of the concession areas on the basis of its entry of April 5, 1977 must fail.

Plaintiff also alleges that the defendants have tortiously interfered with its contractual relations with Bay State. The plaintiff argues and the August option agreement clearly indicates that the defendants were aware of the existence of Bay State's contract with Araserv and the length of its duration. The plaintiff contends that the defendants, having such knowledge, also had to know that Bay State's performance of the concession contract was dependent upon Bay State's possession of the race track. Consequently, according to the plaintiff's reasoning, by purchasing the raceway without assuming the concession contract,[17] the defendants knowingly and intentionally interfered with the plaintiff's contractual relations with Bay State.

■ "It is settled Massachusetts law that the elements which constitute this tort and must be alleged and proved by the plaintiff are: (1) a legally protected interest, (2) intent, (3) conduct which is either *per se* unlawful or is conducted with malice, and (4) damages." *Old Colony Donuts, Inc. v. American Broadcasting Companies, Inc.,* 368 F.Supp. 785, 787 (D.Mass.1974). The only issues which are disputed in the present case are the defendants' intent and the alleged unlawfulness or maliciousness of the defendants' actions in purchasing the race track without assuming the concession agreement. Although the Court believes that the defendants obviously intended to purchase the race track, it is not sufficiently persuaded that their intention in so doing was to induce Bay State to breach its concession contract with Araserv. Notice of the existence of a contract with a third party and the fact that one's actions will render performance of that contract impossible, does not automatically in every case render such actions tortious. While perhaps Bay State's breach of the concession contract was made inevitable by the defendants' actions, plaintiff has not met its burden in demonstrating that it has a likelihood of success in proving that this breach was intentionally induced by the defendants' action. On the basis of the evidence presently before the Court, it is at least equally plausible that plaintiff's injuries, while unfortunate, were merely an indirect consequence of the defendants' lawful conduct.

**16.** There are earlier cases to the same effect: *Palmer v. Fowley,* 71 Mass. 545, 548, 549 (1856); *Bennett v. Conant, supra,* 64 Mass. at 166.

**17.** The plaintiff, of course, assumes, for purposes of this argument, that the defendants purchased the raceway without assuming liability for the concession contract.

[T]he plaintiff must prove that the defendants *directly* undertook to procure a breach of the contract and that it was not enough that such breach was brought about *incidentally* as the result of conduct of the defendants which was otherwise lawful.

*H. D. Watts Co. v. American Bond and Mortgage Company,* 267 Mass. 541, 556, 166 N.E. 713, 718 (1929). (Emphasis added.)

Plaintiff contends that it has submitted sufficient evidence to demonstrate that Bay State is insolvent and therefore only an injunction enjoining the Keelan defendants from interfering with Araserv's operation of the concession business at the raceway will provide the plaintiff with meaningful relief. The plaintiff, citing *Engine Specialties, Inc. v. Bombardier Ltd.,* 330 F.Supp. 762, 768 (D.Mass.1971),[18] and *Beekman v. Marsters,* 195 Mass. 205, 215, 80 N.E. 817 (1907), argue that injunctive relief against third parties such as New England and Foxboro is appropriate when the evidence establishes their "complicity in and inducement of . . . [the] breach." Since I do not believe there is a likelihood that Araserv will be able to demonstrate such intentional inducement or complicity in any breach of the concession contract, injunctive relief on this basis is not appropriate.

Finally, Araserv maintains that the defendants' lock-out of the plaintiff constitutes a disruptive breach of the status quo, thereby entitling the plaintiff to the right to obtain injunctive relief. *Cornett v. Reynolds,* 289 S.W.2d 660, 662 (Tex.Civ.App. 1956); *Deisenroth v. Dodge,* 350 Ill.App. 20, 111 N.E.2d 575 (1953); *Scholz v. Barbee,* 344 Ill.App. 630, 101 N.E.2d 845 (1951). However, these cases, cited by the plaintiff, are inapposite to the present case. In *Cornett v. Reynolds, supra,* the plaintiff owned the land upon which the defendant intended to graze his cattle. The plaintiff was also entitled to possession. Araserv, as discussed *supra,* does not have possession of the property involved herein. In *Deisenroth v. Dodge, supra,* and *Scholz v. Barbee, supra,* the plaintiff had rightful use to the property prior to the action taken by the defendant and had no adequate remedy at law. Araserv has an adequate remedy at law, at least against the Keelan defendants, against whom this injunction is sought, in the form of damages for lost profits.[19]

For all of the reasons stated heretofore, the plaintiff's motion for a preliminary injunction is denied.

---

**18.** This case was affirmed, 454 F.2d 527 (1st Cir. 1972).

**19.** If Bay State is liable for breach of the concession contract, a bill to reach and apply the purchase payment installments due it from the Keelan defendants might be appropriate.