In re COMPETROL ACQUISITION PARTNERSHIP, L.P., et al., Debtors.

CHARLESTOWN HOLDINGS, INC., Immobiliare New England, L.P., Navy Yard Realty Trust, Shipyard Marina Trust, Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORP., Recoll Management Corp., Citizens Bank of Massachusetts, Defendants.

Bankruptcy Nos. 94–622 (PJW) to 94–626 (PJW). Adv. No. 94–90.

United States Bankruptcy Court, D. Delaware.

Aug. 12, 1994.

---

James L. Patton, Jr., William D. Johnston, S. David Peress, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for plaintiffs.

James McC. Geddes, Philip Trainer, Jr., Ashby & Geddes, Wilmington, DE, W. Jeffrey Garson, Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, PA, for defendants.

PETER J. WALSH, Bankruptcy Judge.

## INTRODUCTION

Before the court are Counts I and II of an adversary proceeding brought by the Plaintiffs–Debtors against Defendants Federal Deposit Insurance Corporation and Recoll Management Corporation in which Plaintiffs seek (a) as Count I, the enforcement of the automatic stay of 11 U.S.C. § 362(a) and damages relating to the violation thereof and (b) as Count II, the turnover of certain property of the Debtors' estates in accordance with 11 U.S.C. § 542.[1]

For the reasons set forth below I find for the Plaintiffs on Count I. In light of that finding I need not decide Count II.

## FACTS

### Nature & Stage of Proceedings

Plaintiffs are Charlestown Holdings, Inc. ("CHI"), Immobiliare New England, L.P. ("INE"), Navy Yard Realty Trust ("Navy Yard") and Shipyard Marina Trust ("Shipyard"). (The Plaintiffs are hereinafter referred to collectively as "Debtors".) INE and its general partner, CHI, have a management agreement with the Raymond Group ("Raymond") to operate a marina complex known as the Shipyard Quarters Marina located on Piers 6 and 8 in the Charlestown Navy Yard on Boston Harbor in Boston, Massachusetts ("the Marina"). Navy Yard and Shipyard are Massachusetts real estate trusts which hold title to Piers 6 and 8, respectively, on behalf of INE. Piers 6 and 8 are encumbered by separate mortgages and assignments of rents granted by Navy Yard and Shipyard to secure an $8 million note by INE to the Bank of New England, N.A. The mortgage obligations have been in default since July 25, 1991, at which time a principal balance of $6 million was due.

Defendants are the Federal Deposit Insurance Corporation and Recoll Management Corporation ("Recoll"). Recoll is a real estate management company and attorney-in-fact for the Federal Deposit Insurance Corporation in the latter's capacity as receiver of the New Bank of New England, N.A. and Bank of New England, N.A. (The Federal Deposit Insurance Corporation and Recoll are hereinafter referred to collectively as "FDIC".)

Debtors filed Chapter 11 petitions at approximately 8:30 a.m. on June 27, 1994. The FDIC was at the same time attempting to take possession of the Marina as a mortgagee-in-possession. On June 29, 1994, Debtors filed this adversary proceeding and moved under Bankruptcy Rule 7065 for entry of a temporary restraining order restraining FDIC from further exercise of control over the Marina. After a hearing on June 30, 1994, the court entered a temporary restraining order ("TRO") directing the turnover of the Marina to the Debtors and enjoining any further efforts by FDIC to exercise control over the Marina. Within an hour of entry of the TRO, FDIC returned control of the Marina to the Debtors. After briefing and a hearing on July 12, 1994, the court granted Debtors' application for a preliminary injunction, which continued the relief granted by the TRO, and scheduled a trial on the merits.

Prior to trial, Debtors amended their Complaint of right, Defendants not having answered the original Complaint.[2] Debtors dropped the original Count III and added a new Count III requesting determination by the court of the value of the property encumbered by the lien of FDIC pursuant to 11 U.S.C. § 506. Count III will be tried at a later date.

Trial was held on August 8–9, 1994.

1. References to the Bankruptcy Code, 11 U.S.C. § 101 et seq., are hereinafter cited as "§ _____".

2. The original Complaint consisted of Count I, alleging a willful violation of the automatic stay; Count II, requesting a turnover of the Marina to the Plaintiffs; Count III, requesting a turnover of certain bank accounts in the name of "Shipyard Quarters Marina" from Citizens Bank of Massachusetts ("Citizens"); and Count IV, requesting equitable subordination of FDIC's claim. Count III was dropped in the Amended Complaint, as the TRO had directed Citizens to lift the administrative freeze and granted the Debtors the right to utilize the funds in two of the bank accounts to pay the costs of the ordinary course operation and maintenance of the Marina. Count IV was also dropped, as a result of information obtained during the discovery process.

*Background & FDIC Takeover of the Marina*

Certain of the Debtors were involved in shareholder disputes in a New York state court in 1993. In June of that year, an involuntary Chapter 11 petition was filed in Massachusetts against CHI by Competrol Real Estate Limited ("Competrol"), an unsecured creditor and shareholder of CHI. Competrol moved to have a trustee appointed, alleging "gridlock in the management and control of the affairs of CHI and its affiliated entities, including INE". Testimony indicates that the bankruptcy case was ultimately dismissed, with the Massachusetts bankruptcy judge abstaining, apparently due to the shareholder suits in New York. Immediately prior to these June 27, 1994 bankruptcy filings the parties settled the shareholder suits.

On April 22, 1994, David Brown ("Brown"), a loan officer employed by Recoll, along with other employees of Recoll, entered Pier 6 and Pier 8 to take possession of the Marina as a mortgagee-in-possession in accordance with Massachusetts law and the relevant loan documents. Employees of Raymond objected to Recoll's taking possession, and after several hours in possession Recoll left the property and initiated a Massachusetts state court action against INE, CHI and others. Recoll requested an injunction requiring the defendants to deliver the premises to Recoll.

The parties to the state court action negotiated a stipulation and order which, among other things, provided for a 45–day standstill period during which the parties would attempt to settle their differences. The standstill period expired on June 25, 1994.

Recoll then attempted to take possession of the Marina once more. Brown first walked onto Pier 6 on June 27, 1994 at approximately 7:30 a.m., but left after approximately five minutes. He returned to Pier 6 at approximately 7:45 a.m.

Brown and others from Recoll, including Timothy Fife and Kirk Roth, gathered on Pier 7, which is between Pier 6 and Pier 8 but which is not owned by the Debtors, and then walked onto Pier 8 at approximately 8:00 a.m. While standing on Pier 8 and in front of the Marina office building, Brown read the text of an entry statement sometime between 8:10 a.m. and 8:20 a.m. He recalls that it took him about 1 minute to do so, although Fife recalls that it took him approximately 5 minutes to do so. Brown testified that in addition to Fife and Roth, those present included Recoll's attorney; Holly Fitzgerald of Capstan Management, a marina manager retained by Recoll; a constable and notary; and a videotape operator. Roth and Fife then executed a certificate of entry which was notarized by the constable. Recoll personnel began scotch taping notices they had brought with them to the outside of the Marina office and the Pier 8 gate.

Doug Mason ("Mason"), a Raymond employee and co-manager of the Marina, arrived at Pier 8 at approximately 8:25 a.m., just as Brown had completed his entry speech. Just before 8:30 a.m., Mason opened the Marina office door and let members of the Recoll party into the main reception area of the office. It is necessary to pass through, or by, the office to obtain access to the floating docks which are secured by gates controlled by combination locks.

Brown testified that persons from Recoll asked for keys to the Marina offices and safe but that he was not sure whether anyone specifically asked for access cards to the main gates which control vehicular entry to each pier. He also testified that persons from Recoll already had the combination to the locks on the gates controlling access to the floating docks. No one from Recoll changed either the cards or the combination.

Debtors filed voluntary Chapter 11 petitions at approximately 8:30 a.m. or shortly thereafter.[3] Brown testified that Recoll's arrival at the Marina early in the morning was an attempt to "beat" the opening of the bankruptcy courts.

Between 8:30 a.m. and 9:00 a.m. Recoll employees placed notices around Pier 8 and on the boats. Since the boats are located in the slips of the floating docks of Pier 8, most,

---

3. The first filing was clocked in by the clerk of the court at 8:29 a.m. Since INE is the operat-ing debtor I consider its filing time the most relevant. Its petition was clocked in at 8:35 a.m.

if not all, of the notices were placed on boats well after 8:35 a.m. At Recoll's request, a locksmith company arrived between 9:00 a.m. and 10:00 a.m. to change the Marina locks.

As other Raymond employees began to arrive at approximately 9:00 a.m., they were advised by Recoll of the takeover and told to return at 1:00 p.m. to seek employment by Capstan.

At approximately 9:30 a.m. Recoll commenced the same takeover procedure with respect to Pier 6. Brown, Roth and Fife drove to Pier 6, where Brown read the text of his entry statement for Pier 6. Roth and Fife then executed a certificate of entry. Between 9:30 a.m. and 10:00 a.m. Recoll personnel placed notices on Pier 6 and on the boats in the slips of the floating docks on Pier 6.

Between 10:00 a.m. and 11:00 a.m., personnel from Capstan utilized the Marina office copier to print notices indicating that slip rental payments were to be made to Capstan, and they distributed these notices throughout the Marina.

Copies of the bankruptcy petitions were faxed to the Marina on the afternoon of June 27th and were read by Peter Fitzgerald of Capstan. However, Recoll would not relinquish control of the Marina.

Recoll and Capstan continued to use the existing on-site Raymond employees to conduct the day-to-day operations of the Marina while they were in control. Holly Fitzgerald oversaw the management of the facility.

Debtors contend that they have demonstrated the ability to operate the Marina in a professional manner designed to preserve its value as a going concern. They have taken recent actions, including the retention of new Marina management and steps to resolve permitting issues at Pier 8, which will enhance the value of the Marina. They contend that FDIC's actions while it was in control of the Marina damaged the good will of Debtors' business and created operational difficulties including confusion among slip holders, vendors and employees.

FDIC, on the other hand, contends that Debtors' actions, the actions of the manager of the Marina, the condition of the Marina, and certain other factors, create a situation where the continued value of that property is at risk and will continue to be at risk if Debtors remain in possession. FDIC also contends that its possession of the Marina did not interfere with the business of the Marina.

## DISCUSSION

### Stay Order Violation

In its trial memorandum, FDIC states that the issue as to whether there was a violation of the automatic stay is: "Did the FDIC take possession of the Marina prior to the filing of the instant bankruptcies?" Def.'s Memo at 1. In answering the question, FDIC takes the position that "[p]ossession—as distinct from the concepts of foreclosure and perfection of a security interest in rents—requires nothing more than an open and (arguably) peaceable entry upon the premises in question". Id. at 2. In support of that proposition, FDIC relies on four Massachusetts cases: In re Milford Common J.V. Trust, 117 B.R. 15 (Bankr.D.Mass.1990); In re Concord Mill Ltd. Partnership, 136 B.R. 896 (Bankr.D.Mass.1992); Araserv, Inc. v. Bay State Harness Horse Racing, 437 F.Supp. 1083 (D.Mass.1977); and Corrigan v. Payne, 312 Mass. 589, 45 N.E.2d 829 (1942). I do not find that these cases support FDIC's proposition. Indeed, I find their holdings contrary to its proposition.

In Milford, on January 30, 1990 the mortgagee, following default, entered the debtor's property and posted a notice that it was entering and taking possession and that, henceforth, rents should be paid to its managing agent. A copy of the notice was delivered to each tenant. Thereafter, the debtor instructed its employees to remove the notices and, on January 31, 1990, filed a Chapter 11 petition. The court found that the mortgagee was entitled to the rents. It did not find that simple entry constituted possession. On the contrary:

> Looking to Massachusetts law, an assignment of rent gives the mortgagee a valid security interest which becomes effective upon a default and an overt act by the

mortgagee to take actual or constructive possession.

*Id.* at 15–16. Thus, to secure a perfected interest in the rents, the mortgagee is required to undertake an overt act to take actual or constructive possession. The mortgagee in *Milford* accomplished such overt act by completing entry *and* giving notice to all tenants. Although I need not make a finding at this time on FDIC's claim to the rents (and a resulting "cash collateral" issue"), since FDIC's notice to the tenants (boat owners) occurred after the filing of the petitions, *Milford* suggests that the FDIC does not have a perfected interest in rents.

In *Concord Mill* the court addressed a mortgagee's motion to direct the debtor to turnover rent monies. Following default, the mortgagee sent letters on October 3, 1990 to the debtor's tenants directing them to make payments to the mortgagee instead of the debtor. The mortgagee did not enter the premises at that time. On October 30, 1990 the debtor filed its petition. Subsequently, the mortgagee moved for relief from the automatic stay. The motion was granted on March 29, 1991, and the mortgagee entered upon six of the debtor's nine condominium units. On April 1, 1991, the mortgagee obtained a state court order enjoining the debtor from interfering with the mortgagee's rent collection and directing the tenants to pay the rent to the mortgagee. Later, at the debtor's request, the court vacated the lift stay order. Thereafter, at the mortgagee's request, the court again lifted the stay order. The mortgagee then foreclosed on the property and sought to collect on its deficiency claim by seizing the rent collections. The court found that the mortgagee was only entitled to the rents which accrued after the April 1, 1991 state court order. Since the October 3rd notice to tenants was not accompanied by entry onto the premises, under the *Milford* rationale the court found that the mortgagee did not have a perfected interest in the rents. It found that entitlement to rents requires that "[t]he assignee must (at least) . . . enter onto the property, give notice of its entry to the tenants, and instruct the tenants to begin making their rent payment to the assignee instead of the assignor". *Id.* at 900. Thus, like *Milford, Concord Mill*

(a) does not suggest that mere entry constitutes possession and (b) makes clear that without *both* entry *and* notice to tenants regarding the payment of rent, a mortgagee does not have a perfected interest in rents.

In *Araserv,* following default, the mortgagee entered onto a portion of the premises to take possession. The defendants refused to recognize the mortgagee's asserted right and barred the mortgagee from the premises. The mortgagee claimed that its entry upon the premises entitled it to a possessory interest. The court noted that "[t]he language in [the controlling Massachusetts statute] does not deal with the actual entry or the procedure by which the mortgagee takes possession." *Id.* at 1092. Thus, the court makes clear that possession is not a matter of simple entry. Because subsequent to its entry the mortgagee was ousted, the court found that the mortgagee had no possessory interest.

I need not discuss *Corrigan.* It is factually inapposite, and FDIC relies on a quotation out of context.

■ FDIC's notices to tenants regarding the payment of rent did not occur until after the filing of the petitions. Based on the cases cited by FDIC, I conclude that FDIC did not have possession prior to the stay order.

■ That something beyond mere entry is required to oust the mortgagor and establish possession in the mortgagee is also consistent with general principles of property law. Possession denotes dominion and control and the exercise of such control to the exclusion of others. The Bankruptcy Court for the District of Massachusetts has held that exclusivity is an essential element of possession under Massachusetts law. In *In re Ledgemere Land Corp.,* 116 B.R. 338 (Bankr.D.Mass. 1990), the court stated:

> Possession is one of the more slippery concepts in the law, made more so here by the public nature of the premises. It nevertheless must approach a *degree of exclusivity* which is lacking here.

*Id.* at 341 (emphasis added). *See also, State by State Highway Comm'r v. Hankins,* 59

N.J.Super. 27, 157 A.2d 41, 43 (Law.Div.) (discussing possession of land by use and control to exclusion of others), *rev'd in part on other grounds,* 63 N.J.Super. 326, 164 A.2d 615 (App.Div.1960); *Black's Law Dictionary* 1163 (6th ed.1990) (possession defined as the "detention and control" of anything which may be the subject of property). FDIC failed to show that prior to 8:35 a.m. on June 27, 1994 it exercised a level of dominion and control over Piers 8 and 6 of the Marina such that all other persons were excluded from exercising the same. To the contrary, material acts to secure possession took place well after these bankruptcy cases commenced, including the posting of notices to tenants, the changing of locks and the ejectment of the employees of Debtors' agents. Moreover, it is undisputed that not a single possessory act with respect to Pier 6 occurred until after Debtors filed their petitions.

█ FDIC contends that its entry onto Pier 8 also constituted an entry onto Pier 6 and concomitant possession thereof. In support of this proposition, the FDIC quotes the following from *Araserv:* "It has ... been held in Massachusetts that a mortgagee who enters upon one tract of land under a mortgage which covers two separate and distinct tracts of land is valid as an entry upon the entire mortgage premises." Def.'s Mem. at 9, quoting 437 F.Supp. at 1093 (citing *Bennet v. Conant,* 64 Mass. 163, 165 (1852)). Even assuming the value of an 1852 commercial law case as precedent, the quoted statement cannot support the proposition that a valid entry onto one tract of land covered by a mortgage constitutes a valid entry upon another tract covered by a separate and distinct mortgage. Here, Pier 8 and Pier 6 are separate parcels of land, encumbered by separate mortgages and assignments of rent, and titled by separate nominee trusts. Pier 8 and Pier 6 are not contiguous. They are separated by a condominium development on Pier 7, and Pier 6 cannot even be seen from Pier 8, and vice versa. Thus, even if I were to find that FDIC was in possession of Pier 8 prior to 8:35 a.m. on June 27, such possession cannot be attributed to Pier 6.

█ Since I conclude that FDIC did not have possession of Pier 8 or Pier 6 prior to the filing of the petitions, FDIC's post petition possessory activities violated the automatic stay of § 362(a) and are void *ab initio. Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1206 (3d Cir.1991). In this Circuit, acts in violation of the automatic stay have no force or effect and can accord the party who has violated the automatic stay no additional property rights or interests that it did not enjoy prior to the commencement of the bankruptcy case. *In re Ward,* 837 F.2d 124, 126 (3d Cir.1988). FDIC's citation to *In re Siciliano,* 13 F.3d 748 (3d Cir.1994) as an exception to the void *ab initio* rule has no application here. As of the petitions filings the Debtors had and continue to have possession of the Marina.

Even assuming FDIC had possession of both Pier 8 and Pier 6 prior to the filing of the petitions, the Massachusetts cases suggest that the stay order terminated that possession. In *Araserv,* the court noted that a mortgagee's possession is not valid under Massachusetts law if it is opposed by the mortgagor or any other person claiming the mortgaged property. 437 F.Supp. at 1094. Likewise, in *Milford* the court noted that "the Bank was unable to complete its possession as a result of the Chapter 11 filing and the automatic stay." 117 B.R. at 16. While I need not now decide whether the intervening bankruptcies terminated the FDIC's alleged possession of the Marina, I believe this issue bears on the willful violation issue. That issue, as discussed below, will be decided after additional submissions to the court.

*Willful Violation of the Stay Order*

Debtors claim that the violation of the stay order was willful and that the court should award damages against FDIC pursuant to § 362(h). In response, FDIC argues that it continued to control the Marina after being notified of the Chapter 11 petition in the afternoon of June 27 and until the TRO of July 30 because it had a good faith belief that the FDIC's conduct was needed to protect the value of the collateral and because its lawyers viewed the takeover as not violating the stay order.

■ Based on Recoll's perception of the situation, i.e., the value of its collateral being in jeopardy by reason of alleged in-fighting and accusations of improper conduct of persons controlling Debtors, all as presented in a prior bankruptcy case and a New York state court action, I believe that the FDIC was justified in believing that its retention of the property may have been at a critical juncture and that it needed to carefully weigh whether the stay order did in fact oust it from possession. As well founded as that concern may have been, however, it cannot justify a willful violation of the stay order. It is my understanding that FDIC continued in possession based on the advice of counsel. The basis in law and fact for such advice is not at all clear from the record before me. Consequently, I cannot say at this time that such advice was frivolous. While reserving judgment on this matter, I do observe that at least as to the takeover of Pier 6, in light of the sequence of events placed on the record at the August 8th & 9th hearing, I do not see how such legal advice could be justified, to use the language of Fed.R.Civ.P. 11, "by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law". As pointed out below, I will be addressing an additional aspect of this proceeding later and I will reserve judgment on the willful violation issue until that time. In that connection, counsel may make further submissions to the court. The Debtors' submissions may include a specific statement in support of calculated damages.

*Turnover*

■ In light of my decision on the violation of the stay order and the voiding of FDIC's possessory actions, I need not decide the § 542 turnover count nor any adequate protection issue arising therefrom. If the FDIC believes that its interest in the collateral is not being adequately protected it can initiate a motion for relief. While I do not consider a "cash collateral" issue to be before me, in light of the allegations regarding possible misappropriation of funds I direct that until a further order or a consent agreement provides otherwise, all monies from the Marina operations shall be expended or distributed for no purposes other than necessary and reasonable expenses of, and capital improvements to, the Marina facility.

*Affidavits*

I turn now to a matter of considerable concern and consternation to me. Counsel for both parties filed extensive written submissions in connection with the preliminary injunction hearing of July 12, 1994. At that hearing, I observed on the record that I saw a sharp conflict between the facts set forth in FDIC's affidavit and those in several of the Debtors' affidavits and accordingly was concerned about the veracity of one or more of the affidavits. Because of that concern I directed that at the final hearing the parties present as live witnesses those persons who had submitted affidavits.

At the preliminary injunction stage, the FDIC submitted a July 7, 1994 affidavit of Brown, the loan officer employed by Recoll. Brown testified extensively at the hearing and his testimony addressed matters set forth in his July 7, 1994 affidavit. I found Brown's testimony to be straightforward and candid. However, regarding the events relating to the takeover of the Marina on June 27, 1994, I found his testimony and the stipulated facts to seriously conflict with statements in his July 7, 1994 affidavit. At a minimum, I find that the most important parts of the affidavit contain serious inaccuracies and are misleading. I therefore entertain the notion that the submission of that affidavit by FDIC was with the intent to mislead the court in connection with the preliminary injunction hearing. I will set forth pertinent considerations only briefly.

With the petitions having been filed at approximately 8:30 a.m. on June 27, 1994, the timing of FDIC's takeover activity is critical. The overlapping of the filings and FDIC's takeover activities were not purely coincidental. FDIC planned its early morning takeover to beat the opening of the bankruptcy courts.

In relevant part the July 7, 1994 affidavit states:

6. *At 7:30 a.m.* on Monday June 27, 1994, I, *along with several other employees* of RECOLL, again *entered* the property *and*

*took possession* as a mortgagee-in-possession. *Immediately* upon entering the premises, I read a prepared statement declaring that the FDIC was exercising its rights as a mortgage-in-possession in accordance with Massachusetts law. *At approximately 8:15 a.m., I met with employees* of the management company, the Raymond Group, and again read the prepared statement indicating that the FDIC was exercising its rights to take possession. No one objected to our exercise of possession or requested that we leave.

7. *All* of this occurred prior to 8:30 a.m. on Monday, June 27, 1994. The *only conduct engaged in after 8:30 a.m.* was the securing of the premises and the notification to tenants of where to pay rents.

[emphasis added.] Some of the inaccuracies of the affidavit are revealed by the following stipulated facts and Brown's testimony:

1. The affidavit does not state, or even hint, that FDIC attempted a takeover of two separate properties, Pier 8 & Pier 6, and that none of its activities in furtherance thereof took place with respect to Pier 6 until after 9:30 a.m. Thus, as to the takeover of Pier 6, the affidavit is patently false.

2. Brown's entry onto Pier 8 along with other Recall employees did not occur until approximately 8:00 a.m. Furthermore, there was no entry onto the private area of the premises (i.e. the area as to which the public does not have unlimited access) until sometime after 8:25 a.m. At trial Brown testified that it was "at that point and [sic] time … when we entered the property." August 9th Tr. at 19.

3. The first reading of the prepared statement did not occur until at least 8:10 a.m. and possibly as late as 8:20 a.m. Based on the stipulated facts, I conclude that the first reading occurred closer to 8:20 a.m.

4. Brown met the first Raymond employee, Mason, no earlier than 8:25 a.m. and did not meet another Raymond employee until at least a half hour after encountering Mason.

In response to my questions to Brown, he readily acknowledged a number of the inaccurate statements in his affidavit. He explained that he did not write the affidavit or participate in its drafting. It was written by FDIC's counsel, a member of the law firm representing FDIC in the takeover activity.[4] Brown read the affidavit before signing it but did not make any changes. The record does not disclose the identity of the attorney who drafted the affidavit but does disclose that a member of the law firm was on site with Brown during the takeover of Pier 8 and Pier 6. I find this significant because it suggests that the law firm could not have been mislead on the facts by Brown.

Based on the record before me, I believe that Brown's July 7, 1994 affidavit may have been filed with an intent to mislead the court on important facts bearing on the July 12, 1994 preliminary injunction hearing. Because the record on this matter is incomplete and because the law firm was not present during the August 8th & 9th hearing, I will not draw a conclusion at this time as to whether this conduct constitutes the filing of a false affidavit and, if so, what remedial action should follow. However, through the FDIC's counsel identified above, I direct the law firm to file a response within 20 days from the date of this memorandum opinion. Debtor may file a reply to that response within 20 days thereafter. If Debtors believe that additional discovery on this matter is needed prior to filing their reply they may conduct discovery on an expedited basis, and any depositions (unless it is the deposition of a third party not subject to the control of FDIC or the law firm) shall be conducted at the offices of Debtors counsel. If this schedule places an undue burden on any party or counsel, particularly in light of the current vacation season, counsel should attempt to make an accommodation and confirm it with my office.

As already noted, I have reserved for later decision the issue of a willful violation of the stay order. Since I understood that the law firm gave the advice to Recoll which caused

4. The subject law firm is referred to hereinafter as "the law firm" and is not one of the firms

identified above.

732

Recoll to remain at the Marina until the TRO was issued and because there may be a link between that advice and the July 7, 1994 affidavit, both the willful violation issue and the affidavit issue should be addressed in the same written submissions.

Debtors' counsel should submit a form of order on notice.