OPINION OF THE COURT
David 0. Boehm, J.
Plaintiff, an employee of Conti Packaging Company, sustained injuries when his arm was caught in a meat packaging machine in his employer’s plant. He brought this action against the three defendants, Hooper, Inc., a corporation which had purchased assets of the machine’s manufacturer, Cryovac Division of W. R. Grace & Co., the distributor of the machine, and John A. DeSantis, an employee of Cryovac who was responsible for plaintiff’s training on the machine and for its maintenance and repair.
Plaintiff was injured on July 14, 1979, a Saturday. He had come in to clean, maintain and lubricate the machine, known as a Hooper 1000, which was used by Conti in its *363 sausage making operation. After completing the cleaning and maintenance, plaintiff proceeded to thread packaging laminate through the machine, and as he was doing so, a pneumatic piston activated and trapped his hand between a heating plate and the forming assembly.
The Hooper 1000 machine was manufactured by John Morrell and Company through its Hooper Engineering Division and sold through Cryovac to Conti on or about March, 1974. By an agreement entered into October 30, 1973, Cryovac acted as exclusive distributing agent of the products manufactured by Morrell’s Hooper Division.
About a year and a half later, on August 19, 1975, defendant Hooper, Inc., was incorporated and thereafter, on October 24, 1975, it purchased some of the assets of Morrell’s Hooper Engineering Division and continued the manufacture of the Hooper 1000, together with other equipment and machinery.
By written agreement on October 24, 1975, Hooper entered into a similar distributor’s arrangement with Cryovac whereby Cryovac became the exclusive distributing agent for Hooper’s vacuum packaging machines and parts. Although the agreement did not prohibit Hooper from entering into service contracts with existing owners of its machines or of otherwise servicing previously sold machines, Cryovac had as a matter of practice exclusive direct contact with the purchasers of the Hooper 1000, including Conti, and Cryovac performed all the necessary service work as well as taking orders for machines, equipment and parts. Such orders were submitted by Cryovac to Hooper, which in turn processed and filled them by shipment to Cryovac. Hooper, however, retained a “running list” of all customers.
Representatives of Hooper met with representatives of Cryovac annually, sometimes biannually, and the “general machine was gone over as far as esthetics, mechanical functions, safety features, everything.” In 1977, in a joint effort between Cryovac and Hooper, a list of safety modifications was formulated to improve the safety of the operation of the Hooper 1000. This resulted in the development of a “Safety Kit” for the Hooper 1000 and a bulletin was *364 published by Cryovac, dated June 8, 1977, which stated in part:
“subject: hooper model 1000 safety kit
“Hooper Engineering has requested that we make known to all customers having a Model 1000 the availability of a safety kit for this machine. The items included in the kit are listed and priced individually but can be purchased complete as a kit.
“It is recommended that each of your customers with a Hooper Model 1000 be contacted and informed of the availability of this kit and that the purchase of the kit would be advisable in the interest of maximum safety of operation. The complete kit may be ordered as the Model 1000 Safety Kit.”
At a meeting between representatives of Cryovac and Hooper it was agreed that the safety bulletin would be forwarded to Cryovac’s sales and service representatives, including DeSantis who dealt with Conti. They in turn were to distribute it to the customers to whom they were assigned. A copy of the bulletin was sent to Hooper for its files. It is undisputed that the bulletin was never sent to Conti.
The safety modifications included “Item M”, a rear cover interlock which, when lifted, cut the power to the machine. It is conceded that such an interlocking system would make the machine safer to use because once power was cut, the machine would not operate. It is undisputed that item M was not developed to enhance the efficient operation of the Hooper 1000, but was strictly a safety feature.
Hooper did not review the bulletin before it was distributed by Cryovac, nor did Hooper make any effort to find out whether the safety bulletin was sent to existing owners of the Hooper 1000. The reason given is that it had been the practice and was the arrangement for Cryovac to take care of all correspondence and information to customers, including bulletins, and Hooper relied on Cryovac to disseminate the bulletin.
This motion is now brought by Hooper for summary judgment dismissing the plaintiff’s action against it for *365 negligent failure to warn Conti of the defect in the Hooper 1000. In the alternative, it is brought to compel discovery pursuant to demands for discovery and inspection previously served upon Cryovac and DeSantis.
This is the second motion for summary judgment brought by Hooper. The first motion was brought one year ago to dismiss plaintiff’s actions against it for breach of warranty and product liability. Because Hooper was not responsible under successor corporation liability (see Schumacher v Richards Shear Co., 59 NY2d 239), that motion was granted. However, it was denied with respect to plaintiff’s negligence cause of action in order to provide an opportunity for further discovery as to Hooper’s possible liability for negligent failure to warn (see Schumacher v Richards Shear Co., supra).
Although a successor corporation may have an independent duty to warn customers of its predecessor, such duty arises only when there is a special relationship between the successor corporation and such customers. Hooper’s position is that, as a matter of law, no such relationship can be held to exist between Hooper and Conti because the only contact was between Conti and Cryovac. Hooper further argues that even if there were a duty to warn, it took every reasonable step to fulfill that duty and should not be held liable for Cryovac’s failure to advise Conti of the new, available safety feature.
It is now clear that a successor corporation does not assume liability for the torts of its predecessor unless the four factors enunciated in Hartford Acc. & Ind. Co. v Canron, Inc. (43 NY2d 823, 825) exist. Although successor liability has been extended in other jurisdictions upon the theories of “continuity of enterprise” (Turner v Bituminous Cas. Co., 397 Mich 406) or “product line” (Ray v Alad Corp., 19 Cal 3d 22; Ramirez v Amsted Inds., 86 NJ 332), our Court of Appeals has refused to adopt either rule (Schumacher v Richards Shear Co., supra, p 245). In so doing, it would appear to have aligned New York with the majority of other jurisdictions which have considered the question (Tucker v Paxson Mach. Co., 645 F2d 620; Rhynes v Branick Mfg. Corp., 629 F2d 409; Travis v Harris Corp., 565 F2d 443; Leannais v Cincinnati, Inc., 565 F2d 437, on *366 remand 480 F Supp 286; Shane v Hobam, Inc., 332 F Supp 526; Hernandez v Johnson Press Corp., 70 Ill App 3d 664).
The focus in deciding whether the relationship between the successor corporation and the preexisting customer is sufficient to create a duty to warn has been upon the actual or potential economic advantage to the successor corporation. Consideration has been given to several factors which “may be considered in determining whether there exists a sufficient link to create a duty to warn, among them ‘[succession to a predecessor’s service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, [and] a purchaser corporation’s knowledge of defects and of the location or owner of that machine’ ” (Schumacher v Richards Shear Co., 59 NY2d 239, 247, supra). Where there is sufch a relationship, a duty is created “because of the knowledge which the acquiring corporation possesses or has reason to possess concerning the risk of personal injury created by operation of the machine without a safety guard” (supra, p 243).
Hooper argues that the situation in the case at bar is unlike that in Schumacher v Richards Shear Co. (supra), because there the successor corporation in the same year it acquired the assets of the predecessor contacted the plaintiff’s employer advising it of such acquisition. Thereafter, a serviceman was sent by the successor to service the employer’s shear machine and, eight years later, the employer was again contacted by the successor regarding the same machine and replacement parts were supplied. However, Hooper points out, it never was a party to a service contract with Conti or any other owner of the Hooper 1000. All service and customer contact was provided by Cryovac pursuant to the exclusive distributor arrangement, and only Cryovac would have serviced or offered to service the machines.
Actually, however, there is no real difference. Hooper benefited economically regardless of whether it had a direct relationship with the customers or whether, as happened, its sales and service representative, Cryovac, contacted the customers on its behalf; the end result was the same. All orders obtained by Cryovac redounded to the *367 economic benefit of Hooper. Hooper processed and filled all orders. It is particularly significant that Hooper did not discontinue the manufacture of the Hooper 1000. It not only continued to manufacture it, but continued to improve it. Periodic meetings with representatives of Cryovac were held specifically for this purpose. As Arthur V. Jezuit, vice president of operations of Hooper, testified at the 1984 examination before trial, the safety feature, item M, was included as an item of improvement because “I could compare with something that would make the selling ability much better, to make the machine safer, to make the machine more appearance-wise better” (emphasis supplied). It was “of interest to Hooper that the machines in the possession of the customers be as safe as possible” (emphasis supplied). The use of the word “customers” in this context is particularly significant because it indicates that Hooper viewed the owners of its Hooper 1000, including Conti, as its “customers”, regardless of whether it sold or serviced the machines directly. Similarly, through Cryovac, it knew or was in a position to know the identities of the owners and locations of the Hooper 1000.
That Hooper knew that item M was a safety feature that would improve the safety of the machine is undisputed and, with Cryovac, it developed a bulletin for the purpose of advising all purchasers of the Hooper 1000 that this new safety feature was available for sale (see Leannais v Cincinnati, Inc., 565 F2d 437, on remand 480 F Supp 286, supra; Shane v Hobam, Inc., 332 F Supp 526, supra).
Of the cases which found no special relationship and thus granted summary judgment to a successor corporation, most have focused upon the lack of contact with the predecessor’s customer, or more particularly, the lack of service on the machine in question (see, e.g., Tucker v Paxson Mach. Co., 645 F2d 620, supra; Gee v Tenneco, Inc., 615 F2d 857; Jacobs v Lakewood Aircraft Serv., 512 F Supp 176; Pele v Bendix Mach. Tool Corp., 111 Mich App 343). Hooper’s reliance upon such cases, however, is misplaced. What distinguishes this case from the cases cited to or researched by the court is the presence here of an intermediary between the successor and the customers of the predecessor. The existence of such an intermediary would *368 seem to limit the usefulness of employing the Schumacher factors to determine whéther a special relationship exists.
Discussion of this question should recognize that the enumeration of the factors which have been formulated and employed as a useful means of assessing whether a special relationship exists does not mean that this court should cast aside the ultimate issue (i.e., whether there is sufficient economic benefit accruing to the successor by virtue of its relationship with the customers of the predecessor) in favor of strict adherence to the factors. Indeed, it has been observed that courts do not treat these factors as exhaustive, but rather appear to employ a benefit/burden analysis to determine whether it would be just to impose such a duty (Downtowner, Inc. v Acrometal Prods., 347 NW2d 118, 125 [ND]; see, also, Gee v Tenneco, Inc., supra, p 865; Stratton v Garvey Int., 9 Kan App 2d 254). Furthermore, Schumacher (59 NY2d 239, supra) states only that the factors may be considered in assessing whether a special relationship exists.
Pursuant to the terms of paragraph 3 of the CryovacHooper Distributor’s Agreement, Cryovac is obligated to “use its best efforts actively and vigorously to sell Products and to promote and fully develop the potential for the sale of Products”. By maintaining a service relationship with Conti, Cryovac was in a position to influence future sales of Hooper equipment for the benefit of itself, as well as Hooper. As was observed in Leannais v Cincinnati, Inc. (supra, p 442): “[knowledge of when and where various customers may need additional machinery, and knowledge of the condition of equipment which may need replacement, aré important sales resources.”
In addition to the potential economic benefit accruing to Hooper, there exists also the authoritative relationship Hooper maintained with Conti throughout. Significant in this regard is the statement contained in the safety bulletin published by Cryovac that “Hooper Engineering has requested that we make known to all customers having a Model 1000 the availability of a safety kit for this machine” (emphasis supplied). Such statement would seem to rebut any appearance of Hooper as being remote, detached
*369 or indifferent (see Jacobs v Lakewood Aircraft Serv., 512 F Supp 176, supra; Stratton v Garvey Int., supra), but rather is akin to holding itself out as having expertise in the product line it acquired (see Schumacher v Richards Shear Co., supra, p 248).
For the foregoing reasons Hooper’s motion for summary-judgment is denied.
Alternatively, Hooper argues that it is entitled to summary judgment because, even if there were a special relationship which created a duty to warn, Hooper fulfilled that duty. It points out that it entered into an agreement with Cryovac whereby Cryovac would maintain all customer contacts, that it met with Cryovac to formulate a list of safety modifications, that Cryovac published the list and was to distribute it to the customers, and that á copy of the list was forwarded to Hooper which led Hooper to believe that the list had also been disseminated to the customers. Generally, however, the question of the reasonableness of steps taken by a manufacturer in warning of product defects is a question of fact for the jury (Cover v Cohen, 61 NY2d 261, 276-277). Accordingly, Hooper’s motion for summary judgment on this ground is also denied.
Lastly, Hooper requests that an order be issued compelling Cryovac to respond to demands for discovery and inspection and for names and addresses of all witnesses. These demands were served on or about March 23, 1983. The reply papers submitted on behalf of Cryovac in opposition to Hooper’s motion for summary judgment have not addressed this portion of the motion, and there is no reason why it should not be granted. Accordingly, such motion is granted.