808 F.2d 848
 6 Fed.R.Serv.3d 1187
 Leo F. SANTA MARIA and Joan Santa Maria, Plaintiffs, Appellants,
v.
OWENS-ILLINOIS, INC., et al., Defendants, Appellees.
Leo F. SANTA MARIA and Joan Santa Maria, Plaintiffs, Appellees,
v.
JOHNS-MANVILLE SALES CORPORATION, et al., Defendants, Appellees.
Appeal of EMPIRE ACE INSULATION MANUFACTURING CORPORATION,
Defendant, Appellant.
ESTATE OF Joseph F. ZAMPITELLA, et al., Plaintiffs, Appellants,
v.
OWENS-ILLINOIS, INC., et al., Defendants, Appellees.
ESTATE OF Joseph F. ZAMPITELLA, et al., Plaintiffs, Appellees,
v.
OWENS-ILLINOIS, INC., et al., Defendants, Appellees.
Appeal of EMPIRE ACE INSULATION MANUFACTURING CORPORATION,
Defendant, Appellant.
 Nos. 85-1621, 85-1624, 86-1260 and 86-1318.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 3, 1986.
Decided Dec. 17, 1986.
 
 1
 Neil T. Leifer with whom Thornton & Early, Boston, Mass., was on brief, for Leo F. Santa Maria and Joan Santa Maria, et al.
 
 
 2
 Francis M. Lynch with whom Lecomte, Barber, Emanuelson, Tick & Doyle, Boston, Mass., was on brief, for Empire Ace Insulation Mfg. Corp.
 
 
 3
 Before BOWNES and TORRUELLA, Circuit Judges, and CARTER,* District Judge.
 
 
 4
 GENE CARTER, District Judge.
 
 I. Procedure
 
 5
 Plaintiffs-appellants seek, on this appeal, review of the district court's order of April 1, 1985. The order, entered in the case of Leo F. Santa Maria, et al. v. Owens-Illinois, Inc., et al., Civil No. 80-2642-MA, in the District Court for the District of Massachusetts, grants the motion of defendant Empire Ace Insulation Manufacturing Corp. (hereinafter "Empire-Ace") for summary judgment on the issue of that defendant's liability under New York law as a successor enterprise of Empire Asbestos Products, Inc. (hereinafter "Empire"). In addition, plaintiffs-appellants seek review of the same decision of the district court in eleven other cases of the so-called "Massachusetts Asbestosis Litigation." The Santa Maria case was commenced on November 26, 1980. The complaint originally named some twenty companies alleged to be either manufacturers or sellers, or both, of asbestos or asbestos-related products.[1]
 
 
 6
 The district court initially acted on Empire-Ace's motion for summary judgment in a charge conference of the court and counsel on the thirteenth day of trial. The court had previously taken a motion for summary judgment under advisement. The court stated in the course of the conference:
 
 
 7
 THE COURT: Let me ask: Is there any other defendant who stopped manufacturing somewhere along the line?
 
 
 8
 Of Course, Empire did.
 
 
 9
 Let me say in this connection that I do no[w][2] have an opinion concerning the issue of Empire Ace's successor liability. I will let Empire Ace out. I do not find successor liability as to Empire Ace. And you will have an opinion with findings so that that issue can be raised.
 
 
 10
 App. at 823. Thereafter, the district court filed, on April 15, 1985, its memorandum of decision articulating findings of fact and a rationale for the court's decision absolving Empire-Ace of any successor liability. App. at 825-40. In that memorandum of decision, the court notes its understanding of an agreement between the court and counsel on April 1, 1985. The court states:
 
 
 11
 Although the question of the liability of Empire-Ace as successor to Empire is decided in the case of Leo Santa Maria and Joan Santa Maria v. Owens-Illinois, et al., counsel for all plaintiffs in Massachusetts Asbestos Litigation, M.M.L. 2 cases and counsel for Empire-Ace stipulated that this decision would determine Empire-Ace's successor liability for all M.M.L. 2 cases.
 
 
 12
 App. at 825 n. 1.
 
 
 13
 Following the court's action on April 1, 1985 with respect to Empire-Ace, the trial of the Santa Maria case continued as to the remaining defendants and was completed on April 3, 1985, the fifteenth day of trial, with the jury returning a verdict in favor of the plaintiffs. Thereafter, a final judgment in the Santa Maria case, dated April 16, 1985, was docketed on April 30, 1985. On May 9, 1985, plaintiffs filed a renewed motion for new trial, which tolled the running of the prescribed period for filing a notice of appeal under Fed.R.App.P. 4(a)(1). Fed.R.App.P. 4(a)(4)(iv). Both that motion and a prior similar motion were denied by the district court on June 28, 1985. Thereafter, the plaintiffs filed a joint notice of appeal on July 25, 1985, followed by the filing of a notice of appeal by Empire-Ace on August 7, 1985. Both notices of appeal were timely filed. Fed.R.App.P. 4(a)(1), (3), (4)(iv). Both appeals were from a final judgment, and there was no need for any Rule 54(b) certification by the court.
 
 
 14
 Also pending in the District Court for the District of Massachusetts were eleven other asbestos-injury cases, the subjects of the previously indicated stipulation of counsel, in which a "final judgment" of the district court was entered on February 19, 1986.[3] It is clear from the record and the content of the final judgment of February 19, 1986 that the judgment was intended to implement the agreement among counsel that all of the eleven cases identified in the heading of the judgment should be governed by the final determination to be reached in the Santa Maria case on the issue of whether Empire-Ace was subject to successor liability as the successor enterprise to Empire.[4] The judgment makes a terse finding of "no just reason for delay" pursuant to Rule 54(b).[5] Timely notice of appeal was filed by the plaintiffs and defendant Empire-Ace in each of the eleven cases.
 
 II. Facts
 
 15
 The facts on the substantive issue presented by this appeal are the subject of comprehensive, detailed, and thoughtful findings by the district court set out in the memorandum of decision of April 15, 1985 in the Santa Maria case. The district court described the corporate history of the various entities involved in the following language:
 
 
 16
 Empire Asbestos Products, Inc. was incorporated under the laws of New York on April 27, 1932. At all times relevant to this case--at least after 1947--its president and sole shareholder was Jacob Epstein ("Epstein"). Originally situated on Jerome Street in Brooklyn, by 1947 Empire was located at Atlas Terminal in Glendale, Long Island. Empire was in the business of manufacturing insulation products, some of which contained asbestos. It fabricated air cell pipecovering, a product made with corrugated asbestos paper, and wool felt pipecovering, and it mixed asbestos cements. In addition, it stocked and distributed products manufactured by other companies, including calcium silicate block and pipecovering, fiberglass pipecovering, and millboard. After 1946, it shipped these products to customers in New York, Connecticut, Rhode Island, Massachusetts, New Hampshire, and possibly Maine....
 
 
 17
 ....
 
 
 18
 In the 1940's, the three Kevelson brothers, Nathan, Al and Irving, began doing business as Ace Asbestos. Ace Asbestos Manufacturing Company, Inc. ("Ace") was incorporated under the laws of New Jersey on December 23, 1954, with the Kevelsons as its only shareholders. Its plant, warehouse, and offices were located at 451 Communipaw Avenue in Jersey City, New Jersey. It was a competitor of Empire and carried on virtually the same business: manufacturing air cell and wool felt, mixing cements, and distributing these and the insulation products of other manufacturers. Like Empire, it sold to customers in New Jersey, New York and New England....
 
 
 19
 The defendant in this case, Empire-Ace Insulation Manufacturing Corporation, was incorporated in New York on September 1, 1959 by Nathan and Al Kevelson, Irving having died before then. Although Ace continues to exist today and to hold title to the Jersey City property, the Kevelsons admit that they have conducted their insulation business exclusively under the name of Empire-Ace since 1959.
 
 
 20
 App. at 826-28.
 
 
 21
 The pertinent additional findings of the district court may be summarized as follows. Prior to September 1959, Empire and Ace were competitors, manufacturing and distributing virtually identical products over the same geographical area. Empire's work force prior to 1959 consisted of at least eleven production employees who worked on the corrugating machine and the tables used to assemble the air cell and wool felt, the dry box, and in the saw room. There were also four salesmen: Epstein himself, John Kriesmer, Eric Wellisch, and Bernie Brown. In the period prior to September 1959, Ace employed ten to twenty production workers. Nathan and Al Kevelson both served as salesmen as did John Kriesmer and Harvey Greenfield.
 
 
 22
 On September 16, 1959, two weeks after Empire-Ace was incorporated, the principals in Empire and Empire-Ace executed a written agreement to memorialize a prior oral understanding, by which the latter was to purchase most of Empire's manufacturing operation at Atlas Terminal. That agreement provided (1) for the purchase by Empire-Ace of all of Empire's inventory and equipment at Atlas Terminal, except for certain office furniture; (2) that an inventory would be taken on September 30, 1959 to determine the value of the stock on hand and, by agreement, the value of the plant was established at $50,000; (3) for the payment of the purchase price in cash; (4) that Empire would undertake to procure a lease for Empire-Ace of the Atlas Terminal premises; and (5) that, if Empire should liquidate and dissolve, Empire-Ace had the right to obtain use of Empire's name. In the actual implementation of the agreement, the sale of assets to Empire-Ace was entirely for cash. There was no exchange of Empire-Ace stock for the Empire assets. A key employee was Empire's plant foreman, Peter Muscello. Through the transaction he became Empire-Ace's foreman at Atlas Terminal. He had no involvement in the management decisions of either of the two corporations. The transaction did not result in any of Empire's shareholders, directors, officers, or management personnel becoming associated with Empire-Ace.
 
 
 23
 Empire was not dissolved as a result of the transaction. The agreement itself contemplated, at least as a contingency, that Empire would continue to exist. The principal of Empire, Epstein, continued after 1959 to be engaged in the insulation business in St. Louis under the aegis of Empire of Missouri. Epstein's corporate engagement with an employee, Lonnie Rickard, to secure his continuing services, indicates that Epstein continued to maintain Empire as a corporate entity as late as 1968. That he did so is consistent with the records of the New York Secretary of State, which reflect that Empire was dissolved by proclamation on December 15, 1973. Empire was listed until 1967 in the Manhattan telephone directory as having an office, first on Madison Avenue and then on Fifth Avenue. Empire continued to exist as a corporation under Epstein's control until the late 1960's.
 
 
 24
 Ace's offices were moved in September of 1959 to Empire-Aces's new headquarters at Atlas Terminal without, however, abandoning the Jersey City facility it had previously utilized. For a year to a year-and-a-half, Empire-Ace manufactured and sold air cell insulation at both locations. Following that, Empire-Ace then consolidated its operations at a facility which it had newly constructed in Brooklyn. Machinery was moved from Atlas Terminal to the Brooklyn location, and thereafter Empire-Ace manufactured products only in Brooklyn while continuing to use, until very recently, the Jersey City building, which was Ace's facility, as a warehouse.
 
 
 25
 Empire-Ace's operation at the Atlas Terminal was staffed primarily, although not exclusively, by former workers for Empire. Some Empire production workers retired or resigned. A few Ace employees from New Jersey commuted for a time to the Long Island plant.
 
 
 26
 Although the written agreement of September 16, 1959 appears to contemplate that Empire-Ace would buy all of Empire's inventory and its entire physical plant, the actual transaction resulted in a transfer of fewer than all of Empire's physical assets. Empire-Ace continued to manufacture its air cell product, which was made of an asbestos paper different in size than that which was utilized in the manufacture at Atlas Terminal of Empire's air cell product. Empire-Ace found Empire's corrugating machine to be useless without modifications, and Empire's stock of finished products or corrugated paper was not interchangeable with Empire-Ace's own products or paper. For that reason, Empire-Ace purchased only Empire's inventory of fiberglass products. Empire-Ace did not take over Empire's manufacturing plant at the Atlas Terminal as an operating unit. In order to produce at Atlas Terminal products which Ace had produced in Jersey City, Empire-Ace was required to make "minor but meaningful alterations to Empire's former facility." App. at 832.
 
 
 27
 The principals of the two companies did not negotiate the disposition of every aspect of Empire's business. Empire-Ace made use, whether purchased or not, of some of Empire's physical assets and also of Empire's goodwill, but "did not acquire all of the accouterments of Empire's business as a unitary package." Id.
 
 
 28
 When Empire-Ace was formed, its logo was designed by a principal, Nathan Kevelson, and consisted of the superimposition of the ace of spades, formerly used by Ace as its logo, on a representation of the New York City skyline. Before 1959, Empire had utilized a logo portraying a silhouette of the Empire State Building. The Empire-Ace logo resulted in part from Empire's logo as it existed before 1959. Empire-Ace included Empire in the new corporate name for the purpose of gaining some advantage from the name of the prior operation which it had acquired.
 
 
 29
 Empire-Ace did not acquire in the transaction customer lists, any existing accounts, or access to particular suppliers. It did retain Empire's telephone number, which was an important source of business, when it moved to Atlas Terminal. One of Empire's salesmen in 1959, Mr. Kriesmer, became an employee of Empire-Ace. Mr. Kriesmer[6] "was an attractive asset even without the formal purchase of Empire's accounts because of his knowledge of, and contacts with, customers." App. at 833. Empire and Ace, prior to the transaction, had competed in the same market for the same products for more than fifteen years, often selling to the same customers. Empire-Ace was not in need of acquisition of Empire's intact sales structure in order to establish itself in the new market. Empire-Ace did not purchase or use any of Empire's product designs or manufacturing processes.
 
 
 30
 Empire-Ace continued to use its own, different air cell design of piping insulation, which it had used prior to the 1959 transaction, and also continued to mix its cements according to formulae developed by the principals in Ace prior to the transaction. Empire-Ace did not obtain from Empire any information about such products or formulae. The district court found that "there was no continuity in the identity of Empire and Empire-Ace products." Id.
 
 
 31
 Finally, Empire-Ace assumed none of Empire's regular business obligations. Although the written agreement imposed on Empire the obligation to "try to obtain" a lease at the Atlas Terminal for Empire-Ace, it did not require or enable Empire-Ace to assume Empire's existing lease.
 
 III. Discussion
 
 32
 A. The Finality of Judgment in the Related Cases
 
 
 33
 The appeals in the Santa Maria case are taken from the unquestionably final judgment entered on the district court's order after a full adjudication of all claims in that case. The situation is much different, however, in respect to the eleven cases in which appeal is taken from the "final judgment" of February 19, 1986. Only the claim against Empire-Ace in each of those cases on the successor liability theory has been adjudicated. None of the other numerous claims in those cases have yet been adjudicated. Without more, the adjudication of the claim against Empire-Ace is not, therefore, "final" for purposes of appeal. Fed.R.Civ.P. 54(b) ("In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties...."); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 54.41, at 258 (2d ed. 1986) (the entry of a separate judgment as to one party "remains interlocutory until the ultimate judgment in the action") (footnote omitted).
 
 
 34
 The "final judgment" of February 19, 1986 is a sufficient predicate for appeal at this juncture in those cases if, and only if, the district court's Rule 54(b) certification that there is "no just reason for delay in the entry of Final Judgment" is a proper one. "If the district court improperly applied Fed.R.Civ.P. 54(b), we would have no jurisdiction to rule substantively on the appeal...." Pahlavi v. Palandjian, 744 F.2d 902, 903 (1st Cir.1984). We conclude that we are without jurisdiction over the appeals in the eleven related cases.
 
 
 35
 The court's talismanic statement in the judgment that "there is no just reason for delay in the entry of Final Judgment" is not sufficient to signal a deliberative and properly considered discretionary decision on whether, weighing all the competing concerns and interests arising out of the cases, there is good reason to permit the district court's decision on Empire-Ace's successor liability in those cases to be reviewed on appeal before all other claims in those actions are brought to judgment. We emphasize once again that Rule 54(b) is not a mere formality. The rule "is not intended to dilute the force of the fundamental rule against splitting a cause of action and the piecemeal performance of the appellate function." Durgin v. Robertson, 428 A.2d 65, 68 (Me.1981) (decided under an identical state Rule 54(b)). It is an exception to the general rule against "piecemeal disposal of litigation." Pahlavi, 744 F.2d at 903.
 
 
 36
 The district court must, in deciding to certify an appeal of less than all claims in a case, balance judicial administrative interests against the potential danger of denying justice in those actions by the delay in the trial court associated with an appeal. In order for the appellate court to be able effectively to review the district court's exercise of discretion in permitting an early and piecemeal appeal, which determines the existence of this court's appellate jurisdiction, it is essential that the trial court clearly articulate the factors that it has considered and its reasoning in granting the Rule 54(b) certification. Such certification "should not be entered routinely or as a courtesy or accommodation to counsel." Panichella v. Pennsylvania Railroad, 252 F.2d 452, 455 (3d Cir.1958).
 
 
 37
 As we have only recently said, "At the least, a district court in cases such as this has an obligation to explain its conclusion that there is 'no just reason for delay' in entering final judgment." Pahlavi, 744 F.2d at 905. We have noted that especially where there are contraindications apparent on the face of the record as to the need for, or wisdom of, relaxing the final judgment rule, "a statement of the district court's contrary conclusion is clearly most helpful if not indispensable to an intelligent appellate review of the district court's exercise of discretion." Id.; see also Allis-Chalmers Corp. v. Philadelphia Electric Co., 521 F.2d 360, 364 (3d Cir.1975). In Allis-Chalmers, the court observed:
 
 
 38
 "It is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law."
 
 
 39
 Allis-Chalmers, 521 F.2d at 364 (quoting Protective Committee v. Anderson, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968). Not only does such a statement of reasons provide a predicate for meaningful review, it may well obviate the need for such review and avoid needless imposition upon the appellate process and its resources because "[a] decisionmaker obliged to give reasons to support his [or her] decision may find they do not." Arlinghaus v. Ritenour, 543 F.2d 461, 464 (2d Cir.1976). For these reasons, we have joined the other circuits that require, in any case where question exists on the face of the record, an articulation of the reasons why the district court makes a Rule 54(b) certification. See Pahlavi, 744 F.2d at 905 n. 6 (citing cases).
 
 
 40
 Here, there are apparent from the record several factors which cut against a relaxation of the final judgment rule for purposes of appeal in these eleven cases. The most obvious of these is that there appears to be no need for these eleven cases to be before this court on appeal with the Santa Maria case in order to implement the agreement of counsel that the result in Santa Maria will control on the issue of Empire-Ace's successor liability. It clearly appears that counsel have so stipulated and have so advised the district court, which has no objection to the implementation of the stipulation. A simple entry on the docket in each of those cases in the district court of a stipulation signed by all agreeing counsel would have been sufficient to achieve implementation of counsel's agreement.[7] Any anxieties of counsel as to the future enforceability of such agreement in the related cases can be alleviated, if need be, by court approval of such entry.
 
 
 41
 That expedient could have avoided the physical labor, if nothing more, of transporting and processing eleven asbestos-injury files from the docket of the district court to that of this court. More importantly, the cases would have remained pending in the district court in a posture to permit ongoing pretrial development and motion practice on all issues, unimpeded by the appeal in Santa Maria. Absent certification, all these cases could have continued to proceed through all pretrial stages, and even to trial,[8] without any delay due to the pending appeal in Santa Maria. The entire period from March 14, 1986, the date of the filing of the plaintiffs' notices of appeal in those cases, to the date of this opinion has likely been lost to the litigants in the orderly processing of these cases for trial in the district court. That loss is demonstrably unnecessary. Judicial efficiency in the management of these cases at the trial level has been significantly compromised without justification.
 
 
 42
 In the absence of any articulated reasoning by the district court in support of its Rule 54(b) certification, we are satisfied that the appeal of the eleven related cases is wholly unnecessary and contrary to the interests of efficient judicial administration. Accordingly, we dismiss the appeals in each of the eleven related cases.[9]
 
 
 43
 B. The Merits of the Adjudication of the Successor Liability
 
 Issue
 
 44
 Jurisdiction in the Santa Maria case is based upon diversity of citizenship under 28 U.S.C. Sec. 1332. Therefore, all substantive legal issues are to be resolved on the basis of state law. The district court consulted, as required by Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the choice of law rules of Massachusetts, as the forum state, to determine which state law applied. The court properly concluded that, under the Massachusetts test, the New York law of successor liability was applicable. App. at 834. That conclusion is not contested by any of the parties herein.
 
 We have previously stated:
 
 45
 The general rule in the majority of American jurisdictions ... is that 'a company which purchases the assets of another company is not liable for the debts and liabilities of the transferor.' Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Association, Inc., 437 F.Supp. 1083, 1089 (D.Mass.1977). The general rule is subject to four well-recognized exceptions permitting liability to be imposed on the purchasing corporation:
 
 
 46
 (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.
 
 
 47
 Dayton v. Peck, Stow & Wilcox Co. (Pexto), 739 F.2d 690, 692 (1st Cir.1984) (citing Leannis v. Cincinnatti, Inc., 565 F.2d 437, 439 (7th Cir.1977); Araserv, 437 F.Supp. at 1089-90; 15 Fletcher, Cyclopedia of the Law of Private Corporations Secs. 7122-23) (footnote omitted).
 
 
 48
 The Court of Appeals of New York has recently reaffirmed its acceptance of precisely this statement of the general rule and the four exceptions. Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 244-45, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983); see also Grant-Howard Associates v. General Housewares Corp., 63 N.Y.2d 291, 296, 472 N.E.2d 1, 3, 482 N.Y.S.2d 225, 227 (1984); Hartford Accident & Indemnity Co., v. Canron, Inc., 43 N.Y.2d 823, 825, 373 N.E.2d 364, 365, 402 N.Y.S.2d 565, 566 (1977); Salvati v. Blaw-Knox Food & Chemical Equipment, Inc., 130 Misc.2d 626, 628, 497 N.Y.S.2d 242, 243 (1985); Radziul v. Hooper, Inc., 125 Misc.2d 362, 365, 479 N.Y.S.2d 324, 326 (1984) (dictum).
 
 
 49
 The burden is upon the appellants, as the plaintiffs and moving parties below, to allege facts which bring Empire-Ace within one of these exceptions. Dayton, 739 F.2d at 692; Verhein v. South Bend Lathe, Inc., 448 F.Supp. 259, 261 (E.D.Wis.1978), aff'd, 598 F.2d 1061 (7th Cir.1979). Here, the court initially denied both plaintiffs' and Empire-Ace's motions for summary judgment because there existed issues of fact concerning the 1959 transaction. App. at 825. After approximately thirteen days of trial, the district court, with the agreement of counsel, decided the issue of Empire-Ace's successor liability. The court acted, insofar as factual determinations were made, upon the evidentiary record made in the course of the trial. In such circumstance, we will defer to factual findings of the court and overturn them only if they are "clearly erroneous." Fed.R.Civ.P. 52(a); e.g., Marshall v. Commonwealth Aquarium, 611 F.2d 1, 2 (1st Cir.1979).
 
 
 50
 Against this legal matrix the appellants herein submit several claims of reversible error. The principal contention is that the district court erred in concluding that New York law rejects the "continuity of enterprise" theory as an additional exception to the traditional rule of nonliability of business entities that purchase assets of another. In the alternative, it is contended that the district court erred in considering, as a material factor militating against successor liability, the absence of any continuity of officers, directors, and management as between Empire and Empire-Ace, and in concluding that the continued existence of Empire after the 1959 asset transaction precluded a finding of successor liability on the basis of a de facto merger of the two corporations. We shall address each of these contentions below.
 
 
 51
 1. The Viability of the "Continuity of Enterprise" Exception
 
 
 52
 to the Rule of Nonliability Under New York Law
 
 
 53
 The district court concluded that "New York has rejected broader successor liability based on the 'continuity of the enterprise' ... theories" articulated in certain Michigan and California cases.[10] The court based this conclusion upon language in Schumacher v. Richards Shear Co., Inc., 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. The effect of this conclusion of law was to restrict the district court's consideration of the issue posed in the Santa Maria case to the second and third of the four exceptions to the general rule of nonliability specifically articulated in Schumacher and other New York cases. App. at 835.
 
 
 54
 The contention of appellants is boldly stated:
 
 
 55
 [T]he District Court refused to consider the successor liability issue under the mere continuation exception as developed for products liability cases by this Court and the Michigan Supreme Court. Instead, relying on language in Schumacher ... the District Court ruled that "New York ha[d] rejected broader successor liability based on the 'continuity of the enterprise [sic]".... The District Court then proceeded to analyse [sic] the evidence under the strict traditional criteria for de facto merger or mere continuation and found no successor liability. This was error.
 
 
 56
 Brief for Appellant at 26 (citations omitted). Appellants then proceed to urge that the rejection of continuity of enterprise as an additional exception to the general rule of liability is not compelled by Schumacher because the facts of the case did not generate that issue.
 
 
 57
 In support of their argument, appellants point to the Salvati case, in which a New York trial court took the position that the court of appeals in Schumacher did not reject either the "continuity of enterprise" or the "product line" theories as permissible exceptions to the general rule of nonliability. 130 Misc.2d at 631-32, 497 N.Y.S.2d at 245-46. That court's reading of the opinion led it to conclude that Schumacher "impliedly left open the possibility that in a proper case one or both of them might be adopted." Id. at 631, 497 N.Y.S.2d at 245. Thus, appellants' contention comes down to the proposition that the district court failed to consider the evidence in the Santa Maria case under the continuing enterprise theory as an additional basis for exception to the general rule of nonliability under New York law.
 
 
 58
 It is apparent that the appellants' contention that the continuing enterprise theory is a viable fifth exception to the general rule of nonliability under New York law is predicated upon the appellants' desire to escape from the problems caused to their case by the clear holding of Schumacher, which governs the application of the second recognized exception to the general rule of nonliability.
 
 
 59
 The New York Court of Appeals has been confronted with the question of whether New York law would permit "that liability may be imposed ... for strict products liability based upon recent decisions in other jurisdictions which have extended successor liability." Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. The Court of Appeals specifically noted, as exemplars of those "recent decisions," Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976) (" 'continuity of enterprise' of the seller corporation"), and Ray v. Alad Corp., 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977) (" 'product line' exception"), the very cases upon which the appellants here rely. Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. The court then specifically stated, "[w]e do not adopt the rule of either case but note that both are factually distinguishable in any event." Id. (emphasis added).
 
 
 60
 Interpretation of this single statement becomes the linchpin of the potential controversy as to whether the New York Court of Appeals, by that sentence in Schumacher, rejected the continuity of enterprise or product line continuity theories as a fifth exception to the general rule of corporate nonliability or simply distinguished the facts of the Schumacher case from those of the Turner and Alad cases. Appellants contend for the latter construction of the sentence, and the district court obviously adopted the former construction of the sentence.[11]
 
 
 61
 We are satisfied that the issue thus posed need not turn so definitively on our interpretation of the effect of Schumacher. We believe that were the New York Court of Appeals to confront this case and to apply either the continuity of enterprise theory, the product line theory, or both, it would, at least in the alternative to a holding adopting those theories, distinguish this case, as it did Schumacher from the Turner and Alad cases, and conclude that even under their holdings Empire-Ace is not subject to successor liability.[12]
 
 
 62
 Both the Turner and Alad cases are clearly distinguishable from the present case in crucial factual aspects. First of all, it is crystal clear that under either of these cases it is absolutely essential for the broader exception to the rule of nonliability in products liability cases to come to bear that the injured plaintiff must have been deprived by the asset transaction of an effective remedy against the predecessor corporation that actively manufactured the product causing the injury. Turner, 397 Mich. at 429, 244 N.W.2d at 883 ("[I]n a products liability case where the corporation fabricating the injury-producing item changes corporate structure before injury and suit, as a matter of policy neither the victim nor the successor corporation has a different interest vis-a-vis the suit whatever the type of corporate metamorphosis ... so long as the tranferor corporation becomes defunct ") (emphasis added); Alad, 19 Cal.3d at 31, 560 P.2d at 8-9, 136 Cal.Rptr. at 579-80 ("Justification for imposing strict liability upon a [successor] to a manufacturer under the circumstances here presented rests upon ... the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business....") (emphasis added). In each of these cases the court is at obvious pains to make it explicit that the asset vendor became defunct as a result of the asset transaction. Thus, the policy goal of providing, under products liability law, a remedy to a victim otherwise rendered for practical purposes remedyless is served by the application of the broader exception.
 
 
 63
 Here, of course, on the specific findings of the district court, there is no occasion for the application of the broader rule. The district court found, on a fully supported record, that Empire continued to exist and to do business after the asset transaction. App. at 829-30; see infra p. 861, subsection 3. The terms of the asset transaction here involved did not require that Empire be dismantled and the transaction did not in fact render it defunct. Clearly, neither the Turner nor Alad courts would apply their holdings to this case, and we are confident that the New York Court of Appeals would not do so.
 
 
 64
 Finally, it is clear that each case requires that the successor corporation maintain the continuity of business activity of the predecessor corporation, in the one case, and the continuity of product type and quality in the other. Alad, 19 Cal.3d at 34, 560 P.2d at 11, 136 Cal.Rptr. at 582 ("We therefore conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same products line previously manufactured and distributed by the entity from which the business was acquired.") (emphasis added); Turner, 397 Mich. at 420, 244 N.W.2d at 879 (There must be "a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operations.") (emphasis added). "Continuity is the purpose, continuity is the watch word, continuity is the fact." Id. at 426, 244 N.W.2d at 882.
 
 
 65
 Again, in this case and on the explicit and supported findings of the district court, Empire-Ace did not continue to manufacture the same air cell pipe insulation that Empire had manufactured before the asset transaction, App. at 831-33; see supra Part II, nor did it carry on the same business enterprise as had Empire with the acquired assets. Id.
 
 
 66
 We, therefore, conclude that the district court reached the proper result. While we opine that she was correct in her interpretation of Schumacher as rejecting the holdings of Turner and Alad, we hold that even applying those holdings to the facts as found by the district court, Empire-Ace is not subject to imposition of liability for acts of Empire as its successor.
 
 
 67
 2. The Propriety of the District Court's Determination of
 
 
 68
 the Factors to be Appropriately Considered
 
 
 69
 Appellants contend that the district court committed error because it should have considered, in resolving the issue of successor liability, only specific factual elements of the interrelationship of Empire and Empire-Ace resulting from the 1959 transaction. First, they contend that the court should have considered only the successor's purchase of the predecessor's assets and goodwill, its take-over of the predecessor's plant and employees, and the effective use of the predecessor's name and logo by the successor as the factual elements of the proof properly bearing upon a determination of the question at issue. Brief for Appellants at 30. Their root contention is that consideration of only these factors dictates a conclusion that successor liability should be imposed upon Empire-Ace. Next, the appellants contend that it was improper for the district court to rely upon factual aspects of the proof concerning "successorship," that is, continuity of officers, directors or management. Id. at 39-40. We think that the district court's resolution of the successor liability issue under both the second and third recognized exceptions to the general rule of nonliability in New York law is entirely appropriate.
 
 
 70
 The basis of the second exception is the occurrence of "a consolidation or merger of seller and purchaser." Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. It is clear from the facts, both as found by the district court and from our independent review of the record, that there was nothing approaching a consolidation of Empire and Empire-Ace or a merger of Empire into Empire-Ace, either de jure or de facto. The district court made clear its proper perception of the applicable and established New York principles of law when it stated:
 
 
 71
 In Schumacher, the court held that the mere continuation exception is satisfied only by a full corporate reorganization in which the predecessor is extinguished.... The court also cited, with approval, McKee v. Harris-Seybold Co., 264 A.2d 98, 109 N.J.Super. 555 (1970), and Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F.Supp. 834 (S.D.N.Y.1977). In both of those cases, the courts, in finding no successor liability under the de facto merger and mere continuation theories, relied strongly on the facts that the transactions at issue were for cash and not stock and that both corporations survived the event. McKee, 264 A.2d at 104, 106; Ladjevardian, 431 F.Supp. at 839.
 
 
 72
 There was no continuity of shareholders from Empire to Empire-Ace through the September 1959 transaction, and Empire survived the transaction as a corporate entity even if it ceased manufacturing operations in the New York area. The purchase price of Empire's assets passed as cash to Empire, not as stock of Empire-Ace to Epstein, Empire's shareholder. Whether Empire retained the cash as an asset or transferred it to the ongoing operation of Empire of Missouri is irrelevant. On this basis alone, there is no mere continuation of Empire as Empire-Ace under New York law.... These factors also weigh heavily against finding a de facto merger.
 
 
 73
 App. at 837-38 (citations omitted in part). It is of special relevance to note that in considering the enterprise factors, the district court specifically found those factors "to be in virtual equipoise: Empire-Ace was not a new corporation acquiring every facet of an ongoing concern, but it did enhance its own business by more than just the acquisition of some machinery," App. at 838 (footnote omitted), and found the cogent factors which broke the equipoise to be the absence of any shareholder continuity and the survival of Empire, together with the fact that Empire-Ace did not assume any of Empire's regular business obligations. Id. at 839. She concluded that the facts simply did not show sufficient enterprise continuity to uphold a conclusion of a de facto merger. Id.
 
 
 74
 Finally, the issue generated by the third exception to the general rule of nonliability is to be resolved by factual analysis. It is apparent from the nature of the inquiry required that the court is to make, on a case-by-case basis, an analysis of the weight and impact of a multitude of factors that relate to the corporate creation, succession, dissolution, and successorship. There is no basis in New York law to rule out any single factor that may have relevance in determining what it is precisely that has happened as a matter of fact in a given situation. Obviously, every factor that is relevant to the determination of whether the entity purchasing the assets is, by virtue of the purchase, merely a continuation of the vendor entity is properly to be considered, as was done by the district court.
 
 
 75
 In urging its contention that it was improper for the district court to consider continuity factors, the appellants argue that "[g]iven the size and family oriented history of these companies, those factors were wholly inapposite." Brief for Appellants at 40. At no point do appellants shed a scintilla of logic upon why that should be so. Closely held corporations, family and otherwise, are as much entitled, in the present context, to the benefit of the corporate shield against vicarious or derivative liability and the integrity of their individual existence as are larger, more widely held corporations. There appears to us to be no analytical basis upon which to distinguish between closely held corporations and large corporations for purposes of consideration of the "successorship" factor in determining if successor liability exists. That factor may be, as the district court here properly found it to be, of great significance in any situation in determining whether or not successor liability should be imposed upon a corporate entity. Appellants have pointed to no authority or rationale in New York law that would support such a distinction. We reject it out of hand.
 
 
 76
 3. The Propriety of the District Court's Conclusion That the
 
 
 77
 Continuing Existence of Empire After the 1959
 
 Asset Transaction Precluded a Finding of
 Successor Liability
 
 78
 Appellants argue, finally, that the district court committed error in determining, as it did at App. 837-39, that the survival of Empire following the 1959 asset purchase transaction decisively weighed against the imposition of successor liability upon Empire-Ace under New York law. By a series of attempted artful distinctions between products liability law and other theories of liability, in the first instance, and an unsupported factual assertion that "[i]n every meaningful and practical sense, Empire ceased its ordinary business operations," Brief for Appellants at 43, appellants contend that this conclusion by the district court constitutes reversible error.
 
 
 79
 The contention is without any merit by even the most superficial reading of Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. There, the court specifically limited its decision in that case, after rejecting the broader exceptions to nonliability, to a consideration of whether or not the asset purchaser's post-transaction activities were a mere continuation of the enterprise carried on by the asset vendor prior to the transaction. The court's holding is clear, specific, and not subject to any cavil whatever. The court stated that because the predecessor had survived the purchase agreement "as a distinct, albeit meager, entity, the purchaser of the assets could not be considered a mere continuation of the seller of those assets." Id. Here, the district court found that Empire did survive the asset purchase transaction as a viable entity, App. at 829-30, and there is abundant evidence in the record to support that factual determination. Indeed, it is apparent that, while Empire's geographical and product focus might have changed to some extent, after the transaction, it maintained a substantial ongoing sales and manufacturing presence in the New York market independent of the activities of Empire-Ace. There was nothing "meager" about its continuing existence. Thus the New York principle of law and the district court's well-supported fact-finding coalesce to be properly dispositive, in the full factual context of the case, of any contention that successor liability should be here imposed.
 
 
 80
 It is to be noted, however, that the district court did not, as appellants contend, when its analysis is viewed in toto, treat that successorship by Empire as the exclusive factor determining its result. It properly considered all factual elements of the factual equation, as we have indicated it was proper for it to do, finding that the "enterprise factors" were in equipoise and by the assessment of the weight to be given to the continuity and survival of Empire, broke the equipoise in favor of Empire-Ace's nonliability. App. at 838-39. Thus, appellants' root contention that the factor of Empire's survival was permitted exclusively to determine the result on the successor liability issue is incorrect. It was a factor considered, like other factors, by the district court in resolving the issue. That factor in the process of analysis came to be one of the more predominantly weighty factors contributing to the resolution of the issue by the district court. This is consistent with the holding of Schumacher. The district court treated the "successorship" factor in an appropriate manner.
 
 
 81
 For the reasons set forth hereinabove, the decision of the district court is AFFIRMED in Civil Nos. 85-1621 and 85-1624; and the appeals in the eleven related cases (Civil Nos. 86-1260 and 86-1318) are DISMISSED.
 
 
 
 *
 Of the District of Maine, sitting by designation
 
 
 [1]
 After a comprehensive search of the record, we find that Empire is not, and has never been, a party to either the Santa Maria case or any of the eleven companion cases in which counsel have agreed that Empire-Ace's liability as a successor of Empire would be controlled by the result on that issue in the Santa Maria case
 
 
 [2]
 In the transcript this word appears as "not." This is clearly a typographical error, and we determine from the context that the district judge's meaning is as indicated in the text. This is borne out by the fact that the motion for summary judgment had been pending before the court since February 5, 1985, with voluminous submissions having been made by the interested parties between that time and March 27, when a hearing was had on the motion. The docket entries indicate that decision on the motion was taken under advisement on that date
 
 
 [3]
 Those cases, identified by district court docket number and plaintiff's name, were the following: # 80-2644-MA (Zampitalla), # 80-2806-MA (Kingsbury), # 81-0783-MA (Hartly), # 81-0145-MA (Doyle), # 81-0207-MA (Roche), # 81-0375-M (Foote), # 81-0415-MA (DeSellier), # 81-1069-M (Silver), # 81-2152-MC (Crane), # 81-2271-MA (Johnson), # 81-3266-MA (Hancock)
 On the docket of this court the appeal and cross-appeal in the Santa Maria case are carried under docket nos. 85-1621 and 85-1624. The parallel appeals in the eleven related cases are carried under docket nos. 86-1260 and 86-1318.
 
 
 [4]
 The full text of the final judgment of February 19, 1986, after a heading listing all eleven cases by plaintiff's name and docket number, reads as follows:
 FINAL JUDGMENT
 This action came on for consideration by the Court, Honorable Rya Zobel, District Judge, presiding, and the issue of alleged successor liability having been duly heard in Leo Santa Maria, et al v. Owens Illinois, Inc., et al, C.A. No. 80-2642-Z, and a decision having been duly rendered, and Plaintiffs above named, by their counsel, having agreed to be bound by the Court's decision on the issue of alleged successor liability in the Santa Maria action,
 And the Court, having determined that there is no just reason for delay in the entry of Final Judgment in these cases, directs as follows:
 It is Ordered and Adjudged that the plaintiffs take nothing from defendant Empire Ace Insulation Manufacturing Corporation and that the above actions be dismissed on the merit as to defendant Empire Ace Insulation Manufacturing Corporation only, without costs.
 
 
 [5]
 We expressed at argument our concern as to the existence of a "justiciable controversy" in this case. This concern is based upon the proposition that successor liability is a form of derivative or vicarious liability, predicated upon the existence of liability on the part of a predecessor entity. A predecessor's liability, therefore, must generally be established by adjudication before it can be determined if such predicate liability is passed or imputed to the successor. Here the predecessor, Empire, is not a party to either the Santa Maria suit or to any of the eleven other suits in which the result in the Santa Maria case on the issue of successor liability is to control
 We were, therefore, concerned that our decision on the successor liability issue would be a purely "advisory" opinion on a question which our judgment could not finally resolve absent our ability to adjudicate the predecessor liability. Cf. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). After careful study, however, we are satisfied that there is here "an actual case and controversy" between two parties who have genuinely conflicting interests. See Ellis v. Dyson, 421 U.S. 426, 434-35, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274 (1975). Although an adjudication of Empire's liability to plaintiffs will not be binding upon it, because of its non-party status, it is apparent that plaintiffs and Empire-Ace are procedurally postured to litigate that issue to a result that will be enforceable as between them in each of the eleven cases, just as was done in Santa Maria. Thus, the role of this court in passing upon the issue is limited "to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). A final judgment on the issue will be fully enforceable as between the plaintiffs and Empire-Ace in the context of "the case and controversy" that exists between them in each case. Thus, any concern about "justiciability" is satisfied.
 
 
 [6]
 The district court found that "Kriesmer was a salesman who had worked first for Ace, then for Empire, and then for Empire-Ace in 1959." App. at 831
 
 
 [7]
 Such a stipulation need merely state: "It is stipulated that judgment herein shall be entered on plaintiff's claim against Empire-Ace on a theory of successor liability in accordance with the final judgment on that issue to be entered in Santa Maria v. Owens-Illinois, Inc., Civil No. 80-2642-MA."
 
 
 [8]
 Were the cases to reach actual trial before the decision on the appeal in the Santa Maria case, there would be no need to try the issue of Empire-Ace's successor liability because of the suggested stipulation which would require entry of judgment on that issue in accordance with the result achieved by the appeal in Santa Maria. Only a determination of plaintiffs' damages would be required, against the possibility that successor liability could be imposed on Empire-Ace. This would be made in any event in the adjudication of plaintiffs' claims against the other defendants
 
 
 [9]
 This result does not, even at this date, preclude implementation of counsel's agreement in these cases that the final result reached in the Santa Maria case will control in each of them, which may be achieved by entry of the stipulations suggested supra
 
 
 [10]
 App. at 835. The cases cited by the district court were Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976), and Ray v. Alad Corp., 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977)
 
 
 [11]
 Either interpretation might reasonably have its adherents. Were we pressed to decide which is the proper construction of the court's language, we would conclude from our experience in writing and reading judicial opinions and our knowledge of common strategies of judicial decision-making and their articulation, that the Court of Appeals, by the sentence in question, rejected the holdings of Turner and Alad and, in the alternative, put the issue to rest by pointing out that even if they were to be applied in Schumacher, they would not yield the result sought by the plaintiffs
 In reaching this construction of Schumacher, we have taken into consideration the differing opinions of the two New York trial courts that have commented on the case. In addition to reviewing the interpretation reached by the Salvati court, upon which appellants rely, see text supra, we have also reviewed Radziul v. Hooper, Inc., 125 Misc.2d 362, 479 N.Y.S.2d 324 (1984). In Radziul, the trial court addressed, in the context of a motion for summary judgment, a corporation's duty to warn customers of a product defect where the defendant-corporation had purchased some of the assets of the product's original manufacturer. The court noted, however, that it had previously granted defendant-corporation's summary judgment motion against plaintiff's products liability claim because defendant was not responsible on a theory of successor corporation liability. The court noted that its decision was supported by Schumacher and further noted, in dictum, that "our Court of Appeals has refused to adopt either [the Turner or Alad ] rule." Id. at 365, 479 N.Y.S.2d at 326 (citing Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440).
 
 
 [12]
 Recognition of some doctrinal distinctions among the various exceptions to the general rule of nonliability is here appropriate. The analytical focus in applying the recognized second and third exceptions is almost wholly, in each case, upon what happens to the corporate forms of the parties participating in the asset transaction. The analytical path has a distinctly different focus under the broader exceptions created by the Turner and Alad cases
 It is true that in working out an analysis under any method, the factual data subjected to analysis may be, in many respects, the same data as is used under the other method. Under the Turner and Alad theories, however, though changes in corporate formalism may play some factual role, the focus is upon the activities of the corporate entities after the asset transaction, and principally, upon the activities of the asset-acquiring entity. Under either theory, for products liability law purposes, "distinctions between types of corporate transfers are wholly unmeaningful," Turner, 397 Mich. at 419, 244 N.W.2d at 878. The result of the application of these theories turns upon the normative character of the activity to which the acquired assets are put after the transaction. The central questions put in the course of analysis are whether the assets are used the same way for the purpose of perpetuating an established enterprise activity ; or to achieve the manufacture of a product of the same use, purpose, description, and function as that which resulted from the use of the assets before the transaction.
 Further analytical distinctions and differing doctrinal emphases may be noted between the Turner and Alad theories themselves. The emphasis under the "continuity of enterprise" (Turner ) theory is upon the quality and purpose of the corporate activity resulting from the use of the acquired assets after the transaction. Turner, 397 Mich. at 426, 244 N.W.2d at 882. Under the "product line" (Alad ) theory, the principal vector of analysis is aimed to determine if the products or product line that result from the use of the acquired assets are substantially identical to those produced by the use of the acquired assets prior to the transaction. Alad, 19 Cal.3d at 34, 560 P.2d at 11, 136 Cal.Rptr. at 582. Thus, one may say, in a shorthand way, that in the former case one seeks to establish whether there is substantial continuity of pre-transaction and post-transaction business activities resulting from the use of the acquired assets. In the latter case, one seeks to establish whether there is substantial continuity in the products resulting from pre-transaction and post-transaction use of the assets.